PADOVER v. TOWNSHIP OF FARMINGTON.

Townships—Zoning—Lot Size—Test of Reasonableness—Burden of Proof.

> Burden of proof of showing unreasonableness of township zoning
> ordinance restricting size of lots in order to regulate population
> density and neighborhood growth based thereupon by requiring
> minimum of 20,000 square feet per lot for single residence
> use *held,* not sustained under proofs presented so far as
> plaintiffs' 92.5-acre tract is concerned.

Dethmers and Kelly, JJ., dissenting.

Appeal from Oakland; Ziem (Frederick C.), J.
Submitted April 7, 1964. (Calendar No. 5, Docket
No. 49,906.) Decided February 2, 1965.

Bill by Albert A. Padover and others against the
Township of Farmington, a Michigan municipal cor-
poration, to determine zoning ordinance invalid as

---

References for Points in Headnote

58 Am Jur, Zoning §§ 52, 59.

Reasonableness and validity of zoning regulations prescribing
minimum area for house lots, or requiring a certain lot propor-
tionate to the number of families to be housed. 141 ALR 693.

to their property.  Bill dismissed.  Plaintiffs appeal.
Affirmed.

*Malcolm M. Heber (Schmier & Schmier,* of coun-
sel), for plaintiffs.

*Joseph T. Brennan,* for defendant.

KELLY, J. (*dissenting*).    Plaintiffs filed their bill
of complaint alleging that defendant township's zon-
ing ordinance classified plaintiffs' property as RA–1,
thus requiring minimum lot sizes of a width of at
least 100 feet and an area averaging 20,000 square
feet; that plaintiffs' land is economically suited for
development only if divided into building sites of
not more than 12,500 square feet; that the applica-
tion of the zoning ordinance to plaintiffs' property
unlawfully deprives plaintiffs of the use of the prop-
erty without due process of law.    Plaintiffs con-
cluded their bill of complaint by requesting the
ordinance to be declared void as it applies to their
property.
    The trial court held that plaintiffs had not met
the burden of proving affirmatively that the ordi-
nance was an arbitrary and unreasonable restriction
upon plaintiffs' use of their property and denied
plaintiffs' prayer for relief.
    The township of Farmington is located in Oakland
county, northwest of the city of Detroit, and imme-
diately north of the city of Livonia, in Wayne
county.    The city of Farmington, a home-rule city,
takes out approximately 2 square miles, and the vil-
lage of Wood Creek Farms and Quakertown together
take approximately 2–1/2 square miles, leaving an
area of approximately 31.5 square miles in the town-
ship.
    Plaintiffs purchased their property (approxi-
mately 92–1/2 acres) in 1953 when the zoning ordi-

nance provided for minimum lots of 15,000 square feet. Their property is located in the northeast corner of the township and is bounded on the north by 14-Mile road. The main artery to the east is Inkster road, and to the west Middlebelt road. To the southwest is Northwestern highway. The northern boundary of the property is 534 feet wider than its southern boundary, and the property lies entirely in section 1.

In 1957 the township amended its zoning ordinance and subsequently incorporated its provisions in its zoning ordinance of 1960, which is now being contested by plaintiffs. This zoning ordinance established 4 main classifications, namely RA–1, RA–2, RA–3, and RA–4. RA–1 establishes the minimum average per subdivision of 20,000 square feet and approximately 52–1/2% of the township is so classified; RA–2 establishes the minimum average of 16,500 square feet and approximately 21–1/2% of the township is so classified and zoned; RA–3 establishes a minimum of 12,500 square feet, with about 13–1/2% of the township so zoned; and RA–4 requires a minimum of 7,200 square feet and approximately 12–1/2% of the township is zoned RA–4.

In 1960 a public sanitary sewer was constructed to serve the area, including plaintiffs' land, and there is no dispute as to the requirement that any further future development in the area, including plaintiffs' property, must utilize that sewer.

The ordinance established population control for township units. This was accomplished by dividing the township into 34 divisions, known as "neighborhood units," each unit to have a population of 3,500 to 4,000. Appellee refers to the plan as follows: "The plan prescribes the acceptable range of population within a neighborhood unit. The zoning ordinance, by prescribing minimum lot sizes, controls the number of homesites and thus the population densities."

Mr. Leman, a member of a firm of planning consultants who are retained as such by more than 40 Michigan communities, testified at length as to the extensive time expended in study of the plan for Farmington township which preceded the adoption of the ordinance.

He testified as to the rapid growth of Farmington township, how it had doubled its population between 1940 and 1950, and again doubled the population between 1950 and 1960; that the population at the 1960 census was 25,600, and that the plan decided upon and adopted as the ordinance was arrived at in contemplation of a population of 128,000 in the year 2,000 A.D.

When asked how it was decided the neighborhood units should have a population of 3,500 to 4,000, Mr. Leman answered that while consideration was given to the units' internal street and traffic problems and recreation facilities, yet the prime and controlling reason was the planning for elementary schools.   He testified:

"*Q.* Do you have any guide as to what the maximum population should be in any particular neighborhood?

"*A.* Yes, there is a guide which is used, the elementary school size.   And this, I think, is the most critical guide that we can work with in residential development.   And this we determine through meeting with the school people, through our experience, in many, many areas, also with the State education people on what should be the best and maximum size for a school in any given area.   And the consensus of opinion is that an elementary school should have somewhere in the vicinity of 600 to perhaps 650 or slightly higher elementary school age children to provide proper facilities and not become so large as to be unwieldy or so small as to be uneconomical to operate.   So this has been pretty much of a

guide to us in establishing our densities of population.

"*Q*. And based on a 600 to 700 student population, do you have an estimate of what the ideal population in a neighborhood unit should be?

"*A*. Yes, somewhere around 3,500 to upward to perhaps 4,500, in that vicinity, would be a very desirable size.

"*Q*. That population then would support an elementary school?

"*A*. Yes, it would."

Mr. Mueller, principal planner for the Detroit city planning commission, indorsed the Farmington township ordinance providing for population control, and, also, approved the neighborhood unit of 3,500 to 4,000 people, stating: "That's about the maximum you can go to without providing additional municipal facilities in the form of schools and recreation areas; if it goes beyond that, it means you must have 2 schools in a square mile neighborhood unit, and that creates a lot of problems." He testified that in his opinion the ordinance was proper and consistent with the general development of Farmington township and beneficial to its public health, safety, and general welfare.

Defendant contends that it is as much a protection of the general welfare to provide proper educational facilities to develop the minds of our children as it is to provide safeguards to protect them from disease. Defendant further states it is "on notice by the decisions in *Hitchman, Christine,* and *Roll**\** that it apparently must bear the burden of proof in lot size cases as to the validity of its zoning plan and the reasonable relationship of that plan and the zoning regulations to the public welfare."

\* *Hitchman* v. *Township of Oakland,* 329 Mich 331; *Christine Building Co.* v. *City of Troy,* 367 Mich 508; *Roll* v. *City of Troy,* 361 Mich 540; *Roll* v. *City of Troy,* 370 Mich 94.

The township further states that "there is no question that zoning regulations cannot be speculative and without relationship to existing conditions. *Gust* v. *Canton Township,* 342 Mich 436. This is hardly the situation that prevails in Farmington township, one of the fastest growing suburbs in the Detroit metropolitan area. * * * It is true that ultimate population estimates are based upon the year 2,000, but less than 40 years is a relatively short time in the growth of a municipality."

Mr. Albe Munson, a planning consultant called as a witness for plaintiffs, stated that he liked the present lot size requirements but he didn't think it to be legal, and that "the zoning, as it appears, might be a real nice ideal thing to have, but as far as I'm concerned, the requirements of the enabling act simply state safety, health, and welfare, and on this basis, we have in other communities, restricted our larger size lots to approximately 10,000 square feet, and I would say that in this case, with sewer and water, this might be a reasonable size for this development"; that "I think that the lot sizes are too large for an area with full utilities"; that from the standpoint of protection, public health, public safety, morals, and welfare, it is not necessary to have lots of more than 10,000 square feet.

To show that the zoning of plaintiffs' property as RA–1 bears no substantial relation to the preservation of public health, safety, morals, or general welfare, plaintiffs introduced the testimony of 4 builders and developers. The gist of their testimony was that plaintiffs' property is best suited for residential development and that the topography is such that an average minimum lot size of 20,000 square feet is unreasonable, requiring houses costing in the upper bracket for which there is little market; that the installation of the sewer interceptor system in 1960 has alleviated any possible health problem asso-

ciated with a less restrictive zoning than the present RA–1 classification; that similar land in section 2 to the west of plaintiffs' property (on the southwest corner of Middlebelt and 14-Mile road) is zoned RA–2 and there is no discernible difference between this land and plaintiffs'; that there is a shopping center and church adjacent to plaintiffs' land on the west which detract from the desirability of plaintiffs' property as residential sites, particularly when it is zoned as RA–1.

Plaintiff Abe A. Schmier testified that the highest offer he has received under the present zoning was $2,500 per acre, but he has had offers of $3,500 per acre if the zoning would be changed to 12,500 square feet. The developers and builders called by plaintiffs gave estimates of the value of the land with present zoning, ranging from unsalable to $2,200 per acre, as contrasted with a valuation of $2,500 to $3,500 per acre with zoning of 12,500 square feet minimum lot size, and established the difference in value occasioned by the zoning as a reduction of $50,000 to $100,000.

Farmington township's northern boundary is 14-Mile road and the southern boundary is 8-Mile road. Between 14-Mile road and 12-Mile road the ordinance creates 12 neighborhood units, 1 of which is unit CC, in which plaintiffs' land is located. Each of these 12 neighborhood units is 1 mile square, with the exception of the unit in which plaintiffs' property is located and the unit directly to the west of plaintiffs, namely unit V.

Defendant's planning consultant stated that as the township development was being planned, the planners followed the established roads and were unable to create 1-mile square units for neighborhood units CC and V due to the fact that Northwestern highway cuts across the northeast corner of the township. Thus, we find irregularly shaped neighborhood unit

CC in the northeast corner of the township, bounded on the north by 14-Mile road, on the east by Inkster road, on the south by 13-Mile road, and on the west by Northwestern highway (which runs northwest to southeast). Unit CC, in which plaintiffs' property is located, differs from the other units in that it is separated into 2 parts due to the fact that Middlebelt road, running north and south, extends through the neighborhood unit, placing part of the unit property to the east of Middlebelt road and part of the property to the west of that road.

Defendant states that its zoning plan is based on "neighborhoods of the optimum size [that] will support an elementary school of an ideal size and permit the school to be placed in an ideal location.    *    *    * Proper location of these schools will result in safer conditions for children going to and from school."

Defendant's expert planner, Mr. Lehman, testified that while the prime and controlling reasons for the zoning plan were the elementary schools, consideration was also given to the unit's internal street and traffic problem, and when asked: "I notice that you do have Middlebelt road that passes through a portion of this particular property, is that a good situation?" gave the following answer, "No, that is not a good situation, this is an existing fixed condition which we have to contend with."

Cross examination of the superintendent of the Farmington school district as to "what are the present plans of the school board for serving neighborhood CC (in which plaintiffs' land is located) with schools?" brought forth an unsatisfactory answer: "We will be studying plats as they are presented and buying school sites if and when it is evidenced school sites are required to serve a particular area." And, questioned by the court, the superintendent said that the school board owned no property in

unit CC and alsö stated: "There is nothing sacred about school boundaries, Judge."

The township's planning consultant admitted on cross examination that defendant township had no authority *in re* the operation of public schools or the acquisition of school sites; that while a member of the school board was on the zoning board there was nothing to show that the school board approved, or in any way committed the board, to the zoning plan.

Defendant, recognizing that its zoning plan must meet the time-honored welfare test, states:

: "The appellants' whole case in this area seems to be that desirable houses can be constructed on lots that are smaller than 20,000 square feet. This we concede, but it is beside the point. Defendant believes that the regulations clearly have a 'rational relation to the public health, safety, welfare and prosperity of the community.' *Comer* v. *City of Dearborn,* 342 Mich 471, 477."

Defendant claims it meets this welfare test because "it is as much a protection of the general welfare to provide proper educational facilities to develop the minds of our children as it is to provide safeguards to protect them from disease."

That the zoning plan we are asked to approve is unusual is beyond dispute. Appellee admits it is "relatively new" and that the board "cannot point to a series of venerable cases solidly approving it." This Court has not found, nor had called to its attention, any Supreme Court case that approves a similar plan.

The trial court in denying plaintiffs relief made it plain that such denial did not constitute a judgment of approval or desirability and that defendant prevailed because it had presented at least a debatable question, stating:

"It cannot be said that this case does not present at least a debatable question, the fair difference of opinion, stressed in the *Brae Burn Case* [*Brae Burn, Inc.*, v. *City of Bloomfield Hills*, 350 Mich 425]. This is true even though a powerful argument can be made against the wisdom of the legislation and the method of reaching the determination.

" 'With the wisdom or lack of wisdom of the determination we are not concerned. The people of the community, through their appropriate legislative body, and not the courts, govern its growth and its life. Let us state the proposition as clearly as may be: It is not our function to approve the ordinance before us as to wisdom or desirability.' [*Brae Burn*, p 431.]"

Neighborhood unit CC, including plaintiffs' 92–1/2 acres, located in the extreme northeast corner of the township and separated by roads and highways* from the rest of the 31.5 square miles of township should not have been included with the other 33 units, as the planners, by method of population and homesite control, endeavored to create the ideal neighborhood unit, with its ideal schools, ideally located, so the 600 to 700 elementary school children within the unit could walk to school without crossing heavily laden traffic roads.

The township's answer that it did the best it could under the conditions it had to meet, Middlebelt road dividing unit CC into two parts, or that it did not want to make an exception to the general township plan, is not an answer sufficient for this Court to approve a plan that does not fit and will not work in unit CC, especially at a cost to plaintiffs of somewhere between $50,000 and $100,000.

We grant plaintiffs' prayer that the ordinance *as it pertains to plaintiffs' property* be declared

---

* Fourteen-Mile road to the north; Inkster road to the east; Northwestern highway to the west, and Thirteen-Mile road to the south.

invalid, but deny plaintiffs' prayer that we declare the zoning provisions of RA-3 classification be applied to plaintiffs' property, for the same reasons we set forth in both *Christine Building Co.* v. *City of Troy,* 367 Mich 508, and *Roll* v. *City of Troy,* 370 Mich 94.

The case should be reversed and remanded for entry of decree in conformity with this opinion. Costs to appellants.

DETHMERS, J., concurred with KELLY, J.

ADAMS, J. I am unable to agree with Justice KELLY.

In the present case, contrary to *Christine Building Company* v. *City of Troy,* 367 Mich 508, the trial judge found that the plaintiff had failed to prove affirmatively that the ordinance was arbitrary and an unreasonable restriction upon plaintiff's property. As was stated in *Christine:*

"This Court, however, is inclined to give considerable weight to the findings of the trial judge in equity cases. This is primarily because the trial judge is in a better position to test the credibility of the witnesses by observing them in court and hearing them testify than is an appellate court which has no such opportunity. We do not ordinarily disturb the findings of the trial judge in an equity case unless, after an examination of the entire record, we reach the conclusion we would have arrived at a different result had we been in the position of the trial judge."

In this case, the trial judge visited the property. In his opinion, he reviewed the testimony as to whether there was a reason for differentiating between plaintiffs' property and that of other property

owners which had been zoned for a smaller lot size. He then found:

"The crux of this case is whether the action of the defendant township is an unreasonable, oppressive, and discriminatory exercise of the police power insofar as it affects plaintiffs.

"The Michigan Supreme Court has had frequent occasion to pass upon zoning ordinances. The Supreme Court has held that zoning ordinances, when related to the public health, morals, safety, or general welfare, are a valid exercise of police power, but that such ordinances must be reasonable in their application. One who seeks to have an ordinance declared invalid has the burden of affirmatively proving by competent evidence that the ordinance is an arbitrary and unreasonable restriction upon the use of his property. *Hammond* v. *Bloomfield Hills Building Inspector,* 331 Mich 551; *McGiverin* v. *City of Huntington Woods,* 343 Mich 413.

"Lines of division cannot be arbitrarily drawn by the zoning authorities without regard to the existing characteristics of the area itself or without regard to the reasonable rights of the owners. In every case of hardship the rights of the general public must be weighed against the right of the individual land owner to use his property to the greatest advantage. Significant but not conclusive factors in such a determination are depreciation and loss of use by the property owners as a result of the application of the ordinance. *McGiverin* v. *Huntington Woods, supra.*

"The legal principle is firmly established that zoning ordinances, when reasonable in their provisions, are a valid exercise of the police power. *Village of Euclid* v. *Ambler Realty Co.,* 272 US 365 (47 S Ct 114, 71 L ed 303, 54 ALR 1016); *Austin* v. *Older,* 283 Mich 667. The reasonableness of such an ordinance is recognized as the test of its legality. *Hitchman* v. *Township of Oakland,* 329 Mich 331.

"In determining validity of a zoning ordinance as applied to particular parcel of property, the court must consider whether the zoning of such parcel advances the public health, safety, and general welfare of the people. Each zoning case, as a rule, stands by itself and its reasonableness must be judged by the circumstances in each particular case. *Senefsky* v. *Huntington Woods,* 307 Mich 728, 739 (149 ALR 1433).

" 'In determining whether the invasion of property rights under a purported police power is unreasonable and confiscatory, the extent to which property values are diminished by the provisions of a zoning ordinance must be given consideration.' *Ervin Acceptance Co.* v. *City of Ann Arbor* (syllabi), 322 Mich 404. But it is not enough to invalidate an ordinance that the value of certain property is depreciated, provided what has been done does not amount to confiscation. *Lamb* v. *City of Monroe,* 358 Mich 136, 144.

"In the instant case, there can be no question that the property involved would be more valuable to plaintiffs in the RA–3 classification than in RA–1, but disparities in values will always exist. It cannot be said on this record that this property is unsuitable for the purposes for which it is zoned. The Court finds that the plaintiffs have not established confiscation under the law of this State.

"In addition, the lots of the size required by the ordinance are not out of keeping with the present development of the area. There are subdivisions with slightly smaller lots, but a great deal of the area is subdivided into lots much larger than those required by the ordinance.

"It is argued that the Ward Eagle property was treated differently than plaintiffs' property. These differences are bound to occur in any zoning plan.

" 'Somewhere one zone must end and another start. There will always be peripheral problems.' *Brae*

*Burn, Inc.,* v. *City of Bloomfield Hills,* 350 Mich 425, 435.

"The record shows that the zoning ordinance involved is based upon a comprehensive zoning plan. This plan includes a neighborhood and population survey designed to create within the township residential neighborhoods of a size desired by the planners and the township officials. Whether the plaintiffs, or even this court, may agree or disagree with the wisdom or lack of wisdom of the township's determination, or the method of reaching that determination, it cannot be said that this case does not present at least a debatable question, the fair difference of opinion, stressed in the *Brae Burn Case.* This is true even though a powerful argument can be made against the wisdom of the legislation and the method of reaching the determination. * * *

" 'With the wisdom or lack of wisdom of the determination we are not concerned. The people of the community, through their appropriate legislative body, and not the courts, govern its growth and its life. Let us state the proposition as clearly as may be: It is not our function to approve the ordinance before us as to wisdom or desirability. For alleged abuses involving such factors the remedy is the ballot box, not the courts. We do not substitute our judgment for that of the legislative body charged with the duty and responsibility in the premises' *Brae Burn, Inc.,* v. *City of Bloomfield Hills, supra,* 431."

The testimony was clear that if the property remains as presently zoned it can be developed and sold for a substantial price. Sample lot sizes within the restriction would be: 100' x 200'; 125' x 160'; 150' x 133-1/3'; and 180' x 112'. Consequently, there is no question of confiscation in this case.

The township first adopted a zoning ordinance in 1951. About 1955, it retained a planning firm to

assist the township planning board, the township zoning board, and the township board in the development of a comprehensive zoning plan and a new zoning ordinance. Thereafter until the adoption of the ordinance in September of 1960 the township planning board met at least twice monthly in open meetings. Members of the public, including real-estate developers and builders, were present and allowed to participate. An assistant superintendent of schools served on the planning board for a number of years to provide liaison between the board of education and the planning board. He reported directly to the superintendent of Farmington township school district who testified the zoning plan was beneficial from the school point of view.

The neighborhood units which are the basis of the plan follow generally recognized planning principles —an ideal neighborhood unit population of from 3,500 to 4,500 people, a street layout which will not carry outside traffic, an elementary school located on a safe residential street, a neighborhood small enough so that the elementary school child can walk to school, a school of a size that will provide a quality education—these and many other elements. As was said by Charles Leman of Vilican-Leman & Associates, who drew up Farmington township's master plan:

"All factors relating to community planning were considered and were given detailed study in the development of the plan."

The desirability of planning was testified to by Elmer E. Mueller, principal planner for the Detroit city planning commission, who stated:

"It has cost the city of Detroit hundreds of millions of dollars to correct some of the defects that resulted from improper guidance in the development of the area."

This witness was asked:

"*Q.* Do you feel that deviation from the plan in this case will have any adverse affect upon the plan and upon the public welfare?

"*A.* It would probably adversely affect the entire community. Once you start breaking down standards on which the plan was based, then you upset the whole formula, with damaging results. The street system becomes inadequate, the public facilities become inadequate, and it is generally detrimental to the public welfare."

In *Simon v. Town of Needham,* 311 Mass 560, 563 (42 NE2d 516, 141 ALR 688), where acre building lots were upheld by the court, the court said:

"The establishment of a neighborhood of homes in such a way as to avoid congestion in the streets, to secure safety from fire and other dangers, to prevent overcrowding of land, to obtain adequate light, air, and sunshine, and to enable it to be furnished with transportation, water, light, sewer, and other public necessities, which when established would tend to improve and beautify the town and would harmonize with the natural characteristics of the locality, could be materially facilitated by a regulation that prescribed a reasonable minimum area for house lots.   *   *   *   The advantages enjoyed by those living in 1-family dwellings located upon an acre lot might be thought to exceed those possessed by persons living upon a lot of 10,000 square feet. More freedom from noise and traffic might result. The danger from fire from outside sources might be reduced. A better opportunity for rest and relaxation might be afforded. Greater facilities for children to play on the premises and not in the streets would be available."

In the case of *Senior v. Zoning Commission of the Town of New Canaan,* 146 Conn 531 (153 A2d 415), where zoning regulations increased the minimum lot

size from 2 to 4 acres, the court upheld the increase, saying:

"Even if the plaintiff proved himself correct in his opinion that he could obtain a larger return from the sale of 2-acre lots than from the sale of 4-acre lots, the action of the commission is not thereby invalidated. *Simon* v. *Town of Needham,* 311 Mass 560, 565 (42 NE2d 516, 141 ALR 688). The maximum possible enrichment of developers is not a controlling purpose of zoning."·

Again, in the case of *Levitt* v. *Incorporated Village of Sands Point,* 6 NY2d 269 (189 NYS2d 212, 160 NE2d 501), where 2-acre minimum lot sizes were in· question, the court upheld the validity of the regulation, reasoning that if it was fairly debatable the legislative judgment must control.

The ordinance in question is founded upon the township rural zoning act, PA 1943, No 184, as amended (CL 1948 and CLS 1961, § 125.271 *et seq.* [Stat Ann 1958 Rev and Stat Ann 1963 Cum Supp § 5.2963(1) *et seq.*]), which reads in part as follows:

"Sec. 3. The provisions of the zoning ordinance shall be based upon a plan designed to promote the public health, safety, morals and general welfare, * * * to avoid the overcrowding of population, * * * to reduce hazards to life and property, to facilitate adequate provision for * * * education, recreation and other public requirements, * * * and shall be made with reasonable consideration * * * to * * * population development."

One would not hesitate to condemn the designer of a modern building who failed to make provision for its use for a reasonable number of years. Surely the function of zoning is to plan a modern day community for continuance and growth over a period of years. The growth cannot possibly come at once any more than a seed ·can spring into a tree over

night. Unless the pattern is set and followed, proper·
growth can never materialize. The alternative is
to pay the price in crime, juvenile delinquency, in-
adequate   sewers,   inadequate   roads,   inadequate
schools, inadequate parks, and, worst of all, inade-
quate human beings—a pattern that has been all
too clearly evident upon the American scene. A
city, village, or township, is entitled to work out
a better destiny for itself under such clear statutory
authority.

One has only to look to the history and develop-
ment of our Nation's capital, envisioned according
to a plan that has taken 173 years to ripen into
the present day reality*, to see the benefits which
may accrue. We are dealing with approximately
31–1/2 square miles. The District of Columbia is
69 square miles.

"The wide avenues and streets of the area included
in the L'Enfant plan are appropriately referred
to as outstanding proof of the value of proper
planning. The merit of this generous street plan
was never more widely appreciated than at present,
when other cities are spending millions of dollars
to have their streets widened to meet traffic require-
ments."—"Manual on Origin and Development of
Washington", by H. Paul Caemmerer.

The penchant of this Court to substitute its judg-
ment in zoning cases for that of zoning bodies will
result in this Court becoming a superzoning board
completely contrary to the proposition that: "this
Court does not sit as a superzoning commission."
*Brae Burn, Inc.,* v. *City of Bloomfield Hills,* 350 Mich

---

* August, 1791, Major Pierre Charles L'Enfant sent·his first design
of Washington, D. C., to President George Washington. His plans
were made for a city of 800,000 people, the population of Paris at
that time. The L'Enfant plan, as redrawn by Andrew [David] Elli-
cott, was engraved and published by Washington in 1792.—Washing-
ton: The Story of Our Capital, Alberta Powell Graham; Washington
Village and Capital, 1800–1878, Constance McLaughlin Green.

425, 430, 431; *Cook* v: *Bandeen,* 356 Mich 328, 333; *Uday* v. *City of Dearborn,* 356 Mich 542, 547. I dissent from an opinion which commits this Court to a course of zone busting in communities that have been carefully and, to the best of present day planning expertise, properly planned.

Souris, J., concurred with Adams, J.

Kavanagh, C. J., concurred in result.

Smith, J. (*concurring in affirmance*). I concur in the opinion of Justice Adams because plaintiffs have failed to sustain the burden of proving the zoning ordinance invalid.

This Court said, by way of summary, in *Hammond* v. *Bloomfield Hills Building Inspector,* 331 Mich 551, at 555:

"Each zoning case must be determined upon its own facts and circumstances. *Senefsky* v. *City of Huntington Woods,* 307 Mich 728 (149 ALR 1433); and *Hitchman* v. *Township of Oakland,* 329 Mich 331. There is nevertheless *a presumption in favor of the constitutionality of zoning regulations,* and plaintiffs must sustain the burden of showing that such regulations have no real substantial relation to public health, morals, safety, or general welfare. *Fass* v. *City of Highland Park,* 321 Mich 156; *Northwood Properties Co.* v. *Royal Oak City Inspector,* 325 Mich 419; and *Hitchman* v. *Township of Oakland, supra.* Furthermore, such *an ordinance may not be held invalid unless the constitutional objections urged against it are supported by competent evidence or appear on the face of the enactment in question.* *Portage Township* v. *Full Salvation Union,* 318 Mich 693, and *Northwood Properties Co.* v. *Royal Oak City Inspector, supra.*" (Emphasis supplied.)

To say that plaintiffs had the burden of proof means that plaintiffs had the duty of affirmatively proving facts on the issues by a preponderance of evidence. The duty was not upon defendant township. Although obviously elementary, recent zoning cases in this Court seem to suggest that this elemental rule may not have been in the forepart of the Court's thinking as it approached decision. Of particular reference are the *Troy Cases*.[1] In both cases, the writer was on the prevailing side which found the zoning invalid, yet upon added reflection it would seem that a contrary result might have been reached had we not tended to discredit what appeared to be the speculative nature of population projections (and community needs predicated thereupon) by Troy's witnesses. Certainly plaintiffs' proofs of confiscation were much less than overpowering. Even had the *Troy Cases* shown a more acute awareness of plaintiffs' burden, the results might have been the same. In any event, the instant case presents a special opportunity for vigorously reasserting this first principle of zoning law: that he who attacks a zoning regulation has a real and substantial burden of proving the invalidity thereof, and that, at the outset, such regulation bears the presumption of validity. I concur with Justice ADAMS, therefore, because he has treated this first principle with due respect, as did the trial court.

To this concurrence we might add a short addendum. Any survey of recent cases from the several jurisdictions reveals that zoning decisions exemplify most dramatically the need for sharpening the legal tools which the courts use in resolving zoning appeals. Most decisions fail to recognize the enormous differences between zoning regulations enacted in

---

[1] *Christine Building Company* v. *City of Troy*, 367 Mich 508, and *Roll* v. *City of Troy*, 370 Mich 94.

built-up communities, on the one hand, and zoning regulations for new suburban developments, on the other. Although the aims of zoning are substantially the same in both cases, the usual zoning ordinance in built-up areas occurs after the fact, that is, of building and development, while in suburban communities zoning regulations often come before the fact. For this reason alone, the character of proofs may differ radically, depending upon the kind of zoning under attack. If courts in resolving such disputes are unable to interpret classical zoning principles in terms of present-day necessities, then the law fails both itself and those whom it serves.[2]

With reference to suburban zoning in new communities where undeveloped land is zoned based upon population projections and future needs, both the law and the planning profession need to improve tools and techniques. This is the area in which the Court has become too dogmatic in its insistence that the test of reasonableness be based alone upon present existing conditions. See *Gust* v. *Township of Canton*, 342 Mich 436; and *Christine Building Company* v. *City of Troy*, 367 Mich 508.

If this Court is to remain dogmatic in its insistence upon proofs of validity having an absolute relevance to existing conditions, then all planning and zoning based upon projections for future needs could logically be thwarted. Zoning in a new community where land uses have not already been determined is always prospective in nature. There is the need to plan for expectant population densities so that community needs may be based thereupon: such things as adequate sewerage, streets capable of handling anticipated traffic, recreation areas, schools, and other community facilities are merely some of

---

[2] See NIMLO Municipal Law Review (1964 ed), pp 464–489; 60 Yale LJ 506; and 62 Mich L Rev 131, especially footnotes in the law journal articles.

the items which must be anticipated.[3]  Few of these facilities may be in construction when a new community's zoning is adopted but a community, like a homebuilder, starts with a plan.  The presumption is that if the plan is sound then the structure will also be sound.  It takes time, however, for things to take shape.  Community planners like homebuilders require this initial indulgence.  If plans and projections fail to develop then validity may be challenged.

The obligation to review tools and techniques is not alone that of the courts.  Community planners and municipal officials also have a duty to plan within established principles of zoning law, and their projections must be realistic not fanciful.[4]  Valid postulates of the several professional disciplines involved in planning must be not only asserted but convincingly proved, where the occasion demands.

O'HARA and ADAMS, JJ., concurred with SMITH, J.

BLACK, J. (*concurring in affirmance*).  This case has turned out to be one of unusual difficulty.  All members of the Court are agreed that our judgment is apt to influence permanently the development for residential purposes of many like tracts of vacant land; also that it is bound to have a broadly unpredictable effect, reaching deep into the unplumbed future, upon suburban life in ever more populous southeastern Michigan.  For that reason we have devoted more than an average amount of time to the case.

Some good has arisen from this vexer.  It has brought about a sort of self-generated search for

---

[3] See Justice Schaefer's discussion in the Illinois supreme court case of *Camboni's, Inc., v. County of DuPage,* 26 Ill 2d 427 (187 NE2d 212).

[4] See discussion in 60 Yale LJ 506, at pp 512 and 516.

past error; a search which has been fruitful and now is to be confessionally painful. For myself it appears that Justices ADAMS and SMITH are both right; that some of us have been guilty of uncritical application, of standard zoning precedents, to this newer and narrower field of judicial review of municipal zoning. By "this newer and narrower field" I refer to the invoked test by equity (as here and in the two *Troy Cases*[1]) of the validity of a zoning ordinance which restricts comparatively large tracts of undeveloped land to the platting of larger (one-half to one acre approximately) single-family residential lots, it being agreed:

(a) That the tract in question is suited best to such single family residential use, and

(b) That the controlling question is whether the landowner has made out a case for relief by allegation[2] and proof that he will lose developmental profit if he is ordinance-compelled to build on and sell, or sell prior to building, such larger residential lots.

As is usual in these cases, plaintiffs' proof as above is sharply disputed. Details will be found in Justice ADAMS' opinion. The trouble with all the proof—on both sides—is doubt of its dependability as ground for any judgment or precedent applicable to such newer field. Most of it presents the *predictive* viewpoints only of partisans favoring realty development for profit, or of partisans favoring idealistic planning for the far uncharted future; each group disregarding—to some extent—the fundamental property right or the fundamental public right. The case in such regard is much like another zoning case, *Certain-Teed Products Corp.* v. *Paris Township,*

---

[1] *Christine Building Company* v. *City of Troy,* 367 Mich 508; *Roll* v. *City of Troy,* 370 Mich 94.

[2] The decisive allegation of plaintiffs' instant bill is paragraph 10:

"10. That the plaintiffs represent that the subject land is economically suited for development only if divided into building sites of not more than 12,500 square feet in area."

351 Mich 434. There opponent parties on like opposing testimony asked the Court to peer into the future to ascertain the accuracy of their contradictory prophecies; one dark for the public right and the other equally dark for the private right.

The *Simon, Senior,* and *Levitt Cases,* cited by Justice ADAMS, stand as excellently reasoned authority for upholding Farmington township's ordinance as against plaintiffs' testimonial showing. In particular, at least as appears to the writer, plaintiffs' claim and proof of ordinance-caused loss of profits is not sufficient to persuade that the ordinance confiscates their tract or that it inequitably affects their property rights. Proof that some developmental profit will be lost, the compared amount either being small or uncertainly established, is not enough to justify a finding that the ordinance confiscates, or that it is unreasonable in its application to plaintiffs' said tract.

I do not propose to add more, save to vote for express overruling of the *Troy Cases,* so far as they hold unconstitutional the residential zoning of undeveloped property solely on account of minimally ordained single-family lot sizes accompanied by a testimonial prophecy of consequential loss of developmental profit. When the Court concludes that it has erred on previous occasion or occasions, and is free so to do, the decision or decisions of error should be thus overruled; not ignored or carefully skirted.

I hold that plaintiff has failed to persuade that the defendant township's ordinance actionably affects their rights and therefore vote to affirm.