DOZIER v AUTOMOBILE CLUB OF MICHIGAN

1. COSTS—DAMAGES—ATTORNEYS' FEES.

    A party as a general rule may not recover attorneys' fees, either as an element of the costs of a suit or as an item of damages, unless allowance of a fee is expressly authorized by statute or court rule.

2. COSTS—DAMAGES—ATTORNEYS' FEES—COMMON FUND—EXEMPLARY DAMAGES—FALSE IMPRISONMENT—MALICIOUS PROSECUTION.

    Exceptions to the general rule that disallows attorneys' fees exist (1) in actions where the prevailing party has created or protected a common fund for the benefit of others as well as himself, (2) in actions involving exemplary damages, (3) in actions for false imprisonment or malicious prosecution, and (4) in actions where the present defendant has by wrongful conduct, be it tort or breach of contract, caused the present plaintiff to defend or prosecute previous legal proceedings.

3. COSTS—DAMAGES—ATTORNEYS' FEES—CORPORATIONS—AUTOMOBILE CLUB—BYLAWS—CLASS ACTION.

    Plaintiffs in a class action against an automobile club to obtain changes in the club's bylaws may not recover attorneys' fees, assuming the action conferred a benefit upon either the club members or the club, where (1) no statute or court rule authorizes recovery of attorneys' fees for the plaintiffs, and (2) the benefits secured by plaintiffs are not monetary.

4. CORPORATIONS—BYLAWS—REASONABLENESS.

    The bylaws of any corporation must be reasonable.

REFERENCES FOR POINTS IN HEADNOTES
[1, 3] 20 Am Jur 2d, Costs §§ 73–75, 78–82.
[2, 3] 22 Am Jur 2d, Damages §§ 165–168.
[4] 18 Am Jur 2d, Corporations §§ 165, 168.
[5] 5 Am Jur 2d, Appeal and Error § 822.
[6] 19 Am Jur 2d, Corporations §§ 600, 618, 705, 1082, 1083.
[7] 19 Am Jur 2d, Corporations §§ 600, 601, 624.
[8] 19 Am Jur 2d, Corporations §§ 624, 669–680.

5. APPEAL AND ERROR—EQUITY—COURT OF APPEALS—DE NOVO RE-
     VIEW.

   The Court of Appeals hears and considers chancery cases *de novo*.

6. APPEAL AND ERROR—EQUITY—CORPORATIONS—ELECTION PROCE-
     DURES—REASONABLENESS—COURT OF APPEALS—INDEPENDENT
     ASSESSMENT.

   The Court of Appeals, in a chancery case, will make an indepen-
   dent assessment of the reasonableness of the election proce-
   dures of a nonprofit corporation, be the question one of fact,
   law, or a mixture.

7. CORPORATIONS—NONPROFIT—ELECTIONS—BOARD OF DIRECTORS—
     NONMANAGEMENT CANDIDATES—BYLAWS—FAIR TREATMENT.

   Nonmanagement candidates for the board of directors of a non-
   profit corporation must receive treatment from corporate by-
   laws that is fair when compared to that accorded management
   candidates.

8. CORPORATIONS—BYLAWS—REASONABLENESS—ELECTIONS—BOARD OF
     DIRECTORS—NOMINATION PROCEDURES—PROXY SOLICITATION.

   The bylaws of an automobile club, which provide for nomination
   for election to the board of directors by either a management
   committee or by a petition of 1/2 of 1% of the club members,
   are unreasonable where (1) the effort and expense for nomina-
   tion of a nonmanagement candidate is much greater than the
   minimal effort and expense required for nomination of a man-
   agement candidate, and (2) the management's practice of solic-
   iting proxies with club funds, club facilities, and the club name
   is unfair to nonmanagement candidates who do not have access
   to the proxy solicitation machinery.

Appeal from Wayne, James L. Ryan, J. Submit-
ted December 8, 1975, at Detroit. (Docket No.
22406.) Decided May 27, 1976. Leave to appeal
applied for.

Complaint by Daniel P. Dozier and others
against the Automobile Club of Michigan and
others for equitable relief from the club's allegedly
illegal bylaws. Judgment for defendants. Plaintiff
appeals. Reversed in part, affirmed in part, and
remanded.

*Honigman, Miller, Schwartz & Cohn* (by *Avern Cohn* and *Stanley Siegel)*, for plaintiffs.

*Bodman, Longley, Bogle, Armstrong & Dahling* (by *Theodore Souris, Michael B. Lewiston,* and *Paul L. B. McKenney)*, for defendants.

Before: V. J. BRENNAN, P. J., and M. J. KELLY and G. W. BRITTEN,* JJ.

G. W. BRITTEN, J. Plaintiffs-appellants are all members of defendant Automobile Club of Michigan, a nonprofit corporation existing to promote automobile travel and safety and to provide various services to its members. Three of the plaintiffs are also insurance subscribers of defendant Detroit Automobile Inter-Insurance Exchange (DAIIE), a reciprocal insurance exchange whose board of directors has, for over 30 years, been controlled by and comprised of the same persons that constitute the club's board of directors. In 1971, plaintiffs brought a suit, on behalf of themselves and others similarly situated, in the Wayne County Circuit Court, seeking equitable relief against the defendants.[1]

In brief, the plaintiffs sought both an adjudication that the bylaws of the club were illegal because they effectively precluded the members from participation in the policy making of the club and

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] Plaintiffs also sued Group Insurance Co. of Michigan, Motorland Insurance Co., and the 15 individuals who, at the time the suit was filed, were members of the club's board of directors. Group Insurance Co. and Motorland Insurance Co. are wholly owned corporate subsidiaries of DAIIE. Appellants have directed their appellate arguments to the electorate processes of the club and to the management of DAIIE. Our opinion will focus only on those arguments. We will not consider the legality of the subsidiaries' structures, but we will note the increased financial clout DAIIE and the club carry by their control of the subsidiaries.

the exchange, and an order that the club adopt provisions allowing more meaningful participation in the affairs of the club and the exchange. The court held that the questioned bylaws relating to the election of directors were reasonable and that, despite the history of overlapping membership on the defendants' boards of directors, DAIIE was not the alter ego of the club. The court granted no relief.

Plaintiffs appeal that judgment and ask this Court to declare that the present bylaws of the club are unreasonable, to award attorneys' fees to plaintiffs for the success the plaintiffs have had in forcing extrajudicial changes in prior bylaws, and to declare that DAIIE is an alter ego of the club. We hold only that the club's present bylaws are invalid because they are unreasonable.

The trial judge made extensive factual findings concerning the past history and present structure of defendants. We readily adopt large portions of those articulately stated findings.

The club was organized in 1916 as a nonprofit corporation without capital stock. From 1916 until 1932, the club's bylaws provided for election of the board of directors by the club members, with notice of the nominees and date of annual meeting published in the club's publication, the *Motor News.* In this 17-year period, membership participation in the elections was minimal.[2]

In April of 1933, the club's directors amended the bylaws to provide that at each annual meeting of the board, the board of directors would elect the new board. This procedure was continued through

---

[2] The highest participation was in 1918 when 127 members out of 3,039 voted. The lowest was in 1928, when 30 members out of 78,661 voted. For the average election during the period, less than 1/4 of 1% of the members cast votes.

1972. From 1933 through 1972, no annual meeting was either called or held.

In January, 1972, the club's counsel recommended to the board that the club bylaws be amended to provide for the election of the board of directors by the club membership. The board approved of the suggested amendment.

Before we detail and analyze the reasonableness of the new bylaws adopted by the board, we must dispose of a collateral issue raised by plaintiffs at this point. Plaintiffs maintain that, although the current bylaws are still unreasonable, they represent some improvement over the electoral procedures in use from 1933–1972. Plaintiffs assert that a little membership participation is an improvement over no membership participation at all. They claim that this slight improvement was caused by their 1971 lawsuit—the amendments were adopted, it is claimed, to ward off any equitable orders that might otherwise have been issued. Because they benefited the club membership by forcing change in the bylaws, they argue that they may recover reasonable expenses, including attorneys' fees.

Defendants, on the other hand, advance an independent impetus for the amendments. They offered proofs to show that the 1972 amendments had been contemplated since at least 1970. Because defendants claim that plaintiffs caused no beneficial change, they deny plaintiffs' claim for expenses.

The trial court did not rule on the request for attorneys' fees, nor did it make any determination of the cause of the 1972 amendments. We really have little to work with on review, as there are no "appropriate findings of the judge" that could permit us to sustain or reverse his order on the

question of attorneys' fees. See *State Farm Mutual Automobile Insurance Co v Allen,* 50 Mich App 71, 75, n 2; 212 NW2d 821 (1973). Despite the absence of findings on this issue, we feel compelled to note that plaintiffs have cited no express statute or court rule that would authorize attorneys' fees. As was stated in the *Allen* case:

"As a general rule, our courts have refused to allow recovery of attorneys' fees, either as an element of the costs of the suit or as an item of damages, unless allowance of a fee is expressly authorized by statute or court rule." 50 Mich App 71, 74.

Nor have plaintiffs argued that they are entitled to fees under any of the possible nonstatutory exceptions to the general rule suggested in *Allen:*

"[1] Where the prevailing party has created or protected a common fund for the benefit of others as well as himself * * * [2] [I]n determining the amount of exemplary damages * * * [3] [I]n actions for false imprisonment or malicious prosecution * * * [4] '[W]here the present defendant has by wrongful conduct, be it tort or breach of contract, caused the present plaintiff to defend or prosecute *previous* legal proceedings * * * '" 50 Mich App at 77–78, citing McCormick, Damages, § 66, p 246. (Emphasis by author.)

Plaintiffs argue that other jurisdictions do not require a "common fund" as a condition to payment of attorneys' fees. They cite *Mills v The Electric Auto-Lite Co,* 396 US 375, 393–394; 90 S Ct 616; 24 L Ed 2d 593 (1970), for the proposition:

"[W]here the litigation has conferred a substantial benefit on the members of an ascertainable class * * * the expenses incurred by one shareholder in the vindication of a corporate right of action can be spread among all shareholders through an award against the

corporation, regardless of whether an actual money recovery has been obtained in the corporation's favor."

Plaintiffs' argument is not without considerable merit, although the *Mills* excerpt is clearly distinguishable in that it was discussing a shareholders' derivative suit rather than a class action brought by individuals. Nonetheless, despite the merits of plaintiffs' position, we do not believe that, as an intermediate appellate court, this Court may fashion a further exception to Michigan's general rule on attorneys' fees. Even were the facts to indicate that plaintiffs' litigation efforts conferred a benefit to either the members or the club by forcing the 1972 amendments, the benefit is not monetary. The Supreme Court of Michigan still requires that the benefits secured by litigation be monetary to warrant an award of attorneys' fees. *Bond v Ann Arbor School Dist,* 383 Mich 693, 704; 178 NW2d 484 (1970).

Returning to the consideration of the reasonableness of the 1972 amendments, we again recite the findings of the trial judge. The court listed the pertinent provisions of the amended bylaws:

"1. Five directors of the Club are elected by the members of the Club at each annual meeting to succeed the five directors whose terms expire at that time. The term of office of each of the directors is three years.[3]

"2. Vacancies occurring in the board of directors, resulting other than by expiration of a term, are filled by the board of directors.

"3. Candidates for election to the board of directors to fill a vacancy resulting by the expiration of a term may

---

[3] The bylaws provide that the control and management of the affairs of the club are vested in a 15-member board of directors. Any member of the club in good standing is eligible for a directorship.

be nominated either by the nominating committee of the board of directors, or on petition of the members.[4]

"4. Candidates for election to the board of directors may be nominated on petition of one half of one percent of the members.[5]

"5. A special meeting of the membership may be called upon the written petition of one percent of the members.[6]

"6. Notice of the annual meeting, and meetings at which directors are to be elected, must be given to the membership not less than thirty days prior to such meetings. Such notice is by publication in *The Motor News* which is mailed to master members only.[7]

"7. Notices of meetings at which directors are to be elected must contain both the names of the nominees proposed by the nominating committee of the board of directors, and those nominated by petition of the members.

"8. Members may vote by proxy."[8]

That court also determined that:

"There is no specific provision in the bylaws govern-

---

[4] The bylaws allow the board to elect a president. The president may appoint a nominating committee of three members of the club. The committee files, with the secretary of the club, at least 65 days before the annual meeting, a list of nominees containing as many names as there are directors to be elected.

[5] Nominations by petition must also be filed at least 65 days before the annual meeting. However, a nominating petition need not, unlike the nominating committee list, contain an entire slate of candidates for all vacant seats on the board. The trial court's opinion, to the extent it suggests otherwise, is erroneous on this point.

[6] A majority of the board may also require the president to call a special meeting. Other than these two methods of calling special meetings, the only meeting authorized by the bylaws is the annual meeting held the first Tuesday in December.

[7] As of the date of trial, there were 750,000 master members of the club and 405,000 associate members. An associate member is a spouse, daughter or son of a master member domiciled in the latter's home. The *Motor News*, the club's magazine, is mailed monthly to all master members. All members may vote.

[8] Before a vote may be taken, a quorum of 5% of the membership, present in person or by proxy, is necessary.

ing the manner of solicitation of proxies, either by management or by a member, for election of any candidate to the board of directors. The bylaws do provide that proxy votes shall not be counted for any purpose at any meeting unless they are filed with the secretary at least fourteen (14) days before such meeting. The bylaws further provide that no proxy is valid for more than twelve months."

In the time between the adoption of these new bylaws and the issuance of the lower court opinion, two elections were held using the format established by the new bylaws. Ten directors were elected. All of these ten had been nominated by the nominating committee; there had been no nominations by petition. For the 1972 elections, approximately 126,000 proxies were received by the club's management for the management slate, the result of solicitations for approximately six months. For the 1973 election, proxies were solicited throughout the calendar year and approximately 242,000 were received. In both years, the proxies were solicited from new members at the time of application for membership and from old members through a solicitation form which accompanied the direct mail notice of dues payable and/or membership renewal.

Following the 1973 election, the composition of the board was 15 Caucasian men, with business and professional backgrounds.[9]

The trial court, in considering the bylaws and the two elections held under them, concluded that, although "the extent of member involvement in the management of the affairs of [the] Club is

[9] The individuals are engaged in "such undertakings as the law, education, and accounting and in such varied industries as spice, advertising, steel fabrication, finance, manufacturing, printing, pickle processing, corporate management, insurance, milk distribution, and land investment".

essentially limited * * * to participation in the nomination and election of directors", the limited scope of membership participation in the policy making of the corporation was not unreasonable nor contrary to public policy. He additionally concluded that the means of exercising that limited power—*i.e.,* membership nominating petitions and membership voting powers—was not unreasonable nor contrary to public policy.[10]

We respectfully disagree with the trial court concerning the reasonableness of the nomination and election procedures. We believe that nonmanagement candidates must be allowed easier access to the nomination and election machinery used to elect the club's board of directors.

All involved in this case agree that the bylaws of any corporation must be reasonable. *Allnutt v Subsidiary High Court of United States Ancient Order of Foresters,* 62 Mich 110; 28 NW 802 (1886). While the opinions in *R E Townsend Corp v Gleaner Life Insurance Society,* 298 Mich 10; 298 NW 385 (1941), suggest that the reasonableness of the bylaws is a question of fact, that case cannot be cited to preclude our review of the trial court's conclusion on the reasonableness of the bylaws. Our Court hears and considers chancery cases *de novo. Padover v Farmington Twp,* 374 Mich 622, 632; 132 NW2d 687 (1965). We are thus able to make our own independent assessment of the reasonableness of the election procedures, be the question one of fact, law, or a mixture.

---

[10] This bifurcation of the issues—reasonableness of scope of membership participation in policy making and reasonableness of the means of membership participation in electing the board of directors —may be unnecessary. If the membership has reasonable means available to elect the policy makers, it will presumably have a reasonable representative input into policy making. We will therefore concentrate on the reasonableness of the nomination and election procedures.

In assessing the reasonableness of the bylaws, the trial judge did not focus on any disparity in treatment afforded insurgent nominees as compared to management nominees. He stated:

"The question is not whether it is reasonable to require more burdensome qualification procedures of nonmanagement aspirants than is required of 'management' candidates, but whether the procedures for nomination and election available to members are, themselves, unreasonable."

Our focus is different. It appears that a comparison of the burdens borne by insurgent candidates, as opposed to management nominees, is the proper approach to this case. By adopting a comparative analysis, we do not suggest that nonmanagement candidates for the board of a nonprofit corporation must in all cases have superior or equal advantages in an electoral battle. We suggest only that nonmanagement candidates must receive treatment that is fair when compared to that accorded management candidates. Our inquiry will proceed on a step by step basis, from initial nomination to election, comparing the burdens borne by each candidate.

Management candidates for the board are nominated by the nominating committee, which in turn is appointed by the president of the club. The president is a member of the board, named to the position by his fellow board members. It is apparent that the board of directors can easily control the nominations; it is also apparent that little, if any, effort or expense is required for board members to gain renomination and to perpetuate themselves in office.[11]

---

[11] After the two elections, 11 of the 15 1972 directors were still on the board.

Nonmanagement candidates must secure the signatures of 1/2 of 1% of the membership—5,775 of 1,155,000 members as of the trial date—before they qualify as nominees. The trial court believed that members could station themselves outside club offices and solicit signatures from club members. The only evidence on the difficulty of securing signatures was testimony that some 1,500 to 1,800 signatures were obtained in "a few days" by soliciting in the lobby of the main club office and at "a few" of its branch offices. The trial court also believed that interested petitioners might imaginatively gather the required signatures by other procedures, "[taking] into account the fact that one in every four registered owner [sic] of a passenger vehicle in Michigan is a club member".

The trial judge did not believe it proper to allow nondirectors access to the list of club members, stating that the "evils inherent in permitting such a practice are too obvious to require delineation". Nonetheless, defendants at appellate argument have conceded that MCLA 450.1487(2); MSA 21.200(487)(2), applicable to the club by MCLA 450.117; MSA 21.118, requires that corporations provide board candidates with access to membership or stockholder lists. Upon copying the list of members, prospective candidates could presumably mail out requests for the requisite number of signatures and for proxies.[12]

These three suggested methods of solicitation—club premises lobbying, driver solicitation, and membership mailing—are argued to be practicable means for satisfying the bylaws requirement of the signatures of 1/2 of 1% of the members. The ease of compliance, it is argued, makes the requirement

---

[12] The estimated cost of a mailing to all club members as of the trial date was $250,000. This has presumably increased.

reasonable. We disagree. Each of the three proposed methods requires considerably more effort and/or expense than the minimal effort and/or expense required of a management candidate. Despite the obvious disparity, defendants maintain that the petition requirement is reasonable. An analogy to petition requirements for public office is urged upon us, and was in part adopted by the trial court. It is argued that because certain statutes require that candidates for public offices obtain nominating petition signatures, the club's parallel requirement is similarly lawful and reasonable. We believe the analogy fails to support the validity of imposing petition requirements only on the nonmanagement candidates. The analogy only suggests an across the board petition requirement may be reasonable.

Most of the statutory nominating petition requirements impose a petition burden on all candidates rather than on only one candidate or slate. See MCLA 168.53; MSA 6.1053 (Governor); MCLA 168.93; MSA 6.1093 (United States Senator); MCLA 168.133; MSA 6.1133 (Representative to United States Congress): MCLA 168.163; MSA 6.1163 (State Senator or Representative);[13] and MCLA 168.349; MSA 6.1349 (township officers).

The only exceptions to the general rule of comparable, across the board, petition requirements are judicial elections. For nearly all judicial elections, an incumbent, unlike a challenger, need not satisfy a petition requirement.[14] Compare MCLA

---

[13] In lieu of filing petitions, any candidate for the state Legislature may file for primary elections by payment of a $100 filing fee. Similar provisions are found in MCLA 168.193; MSA 6.1193 (county officers); MCLA 168.224; MSA 6.1224 (county auditor); MCLA 168.254; MSA 6.1254 (county road commissioners). Incumbents and challengers for all these offices bear comparable burdens.

[14] An incumbent State Supreme Court Justice may renominate himself merely by filing an affidavit of candidacy. His opponent need

168.409b(1); MSA 6.1409(2)(1), with MCLA 168.409b(2); MSA 6.1409(2)(2) (Court of Appeals Judge). Compare MCLA 168.413; MSA 6.1413, with MCLA 168.413a; MSA 6.1413(1) (Circuit Court Judge); compare MCLA 168.433; MSA 6.1433, with MCLA 168.433a; MSA 6.1433(1) (Probate Court Judge); and compare MCLA 168.467b; MSA 6.1467(2), with MCLA 168.467c; MSA 6.1467(3) (District Court Judge). See also MCLA 168.426d; MSA 6.1426(4) (Municipal Court Judge).

The defendants' analogy to the election of judges is superficial. Admittedly, an incumbent judge, like a management candidate, need not satisfy the petition requirements imposed on a challenger. This comparison does not convince us of the reasonableness of the club's petition requirements. The advantages possessed by a judicial incumbent carry him only to the primary stage. The judge must still face the general election under comparable terms with a challenger. The club's management slate is able to ride the initial nominating advantage through the general election, for there is no intermediary primary serving to temper the initial advantage. Moreover, there exists a clear purpose for the easier access to the primary stage afforded judicial incumbents. The Legislature has determined that a sitting judge should not be required to solicit publicly the nominating signatures of the citizens who daily petition his court. Once a judge has been elected, the general citizenry is called upon to support or to reject his candidacy by secret ballot, not by public nominating petitions. Whether this procedure favoring

---

not secure nominating petition signatures, but must be nominated by a political party to contest the incumbent. Compare MCLA 168.392a; MSA 6.1392(1) with MCLA 168.393; MSA 6.1393. This is an advantage for incumbents, but the burden borne by challengers is not analogous to the petition burden borne by nonmanagement candidates to the club's board of directors.

judicial incumbents is just is not the question we face. We note only that this policy or any equally convincing policy is clearly absent in assessing the reasonableness of the club's nomination requirements. Because the policy argument is absent, the analogy to public elections fails. We conclude that the petition requirement is highly burdensome—in effort and in expense—when compared with the nominating machinery available to management candidates.[15]

The unreasonableness of the petition requirement is manifested even more when considered with the proxy solicitation mechanics. It appears that even if a nonmanagement candidate solicits the requisite number of signatures, a number of the petition-signing members may be already committed by proxy to the management slate. A candidate may be nominated but, even after satisfying the arduous petition requirement, the chances of election appear remote.

The trial judge found that management solicits proxies throughout the year—when new members apply and when renewals, dues notices and dues reminders are mailed. The club's funds and facilities are thereby used to secure proxies from members that are valid from the very first day of new or renewed membership. The trial court found that the management successfully solicited 126,000 proxies for the 1972 annual meeting and 242,000

---

[15] *Valle v North Jersey Automobile Club,* 125 NJ Super 302; 310 A2d 518 (1973), where the bylaws required 5% of the membership—5,000 signatures from the club's 100,000 members—found "that that number of members file a written certificate of such nominations would appear to be so burdensome as realistically to preclude independent nominations being made." 125 NJ Super at 318;310 A2d at 526. The *Valle* court did not employ a comparative perspective in assessing the bylaws; the requirement was invalid in and of itself, without being compared to the relative ease of management nomination.

proxies for the 1973 meeting. The proxies solicited were open-ended, giving total control of the vote to two incumbent directors and the executive vice-president for use at any meeting for any candidate. It is apparent solely from the number of proxies that management obtained, using club funds, that a nonmanagement candidate would face a nearly insurmountable barrier in a contested election.

Moreover, it appears that, as the management candidates run as a slate and receive an identical number of proxy votes, a nonmanagement candidate must beat every management candidate to win. Nonmanagement candidates, if not aligned with each other, will possibly battle each other for the honor of a sixth place finish. The management slate must be considered a monolith, incapable of being dislodged from the club board room.

Even if a member signs a nominating petition, it is likely that his vote has already been solicited, if not procured, by the management. Of course, a proxy is not irrevocable. The bylaws provide for revocation by a subsequently dated proxy. An insurgent could solicit both the nominating signature and a proxy vote at the same time and thereby invalidate a previously given proxy. However, if the petition signer receives a subsequent membership renewal and proxy solicitation from management, the insurgent proxy solicited at the time of petitioning could be invalidated. Conceivably, the club could time the mailing of renewal or dues notices, accompanied by proxy solicitation, to thwart even the most well financed and organized nonmanagement proxy campaign.

This method of soliciting proxies gives a definite advantage to management. The incumbent board is favored in two important ways:

"First, an incumbent board uses corporate facilities to solicit proxies on its own behalf, while insurgents * * * must * * * pay out of their own pockets the expenses of preparing, * * * printing, and distributing their proxy statement and proxy card. Second, incumbents gain an important psychological advantage in soliciting under the name of 'the corporation' rather than their own names, as the insurgents must do." Eisenberg, *Access to the Corporate Proxy Machinery,* 83 Harv L Rev 1489, 1503–1504 (1970).

While the bylaws do not mandate any particular time, method, or form of proxy solicitation, neither do they preclude the management from utilizing the present practices. The management uses club funds, club facilities, and the club name to solicit proxies for management candidates. This is not a prohibited practice in itself, but the lack of insurgent access to similar proxy solicitation machinery makes the management's practice comparatively unfair and hence unreasonable.

The only provision in the bylaws explicitly allowing nonmanagement candidates use of club funds is the requirement that the names of all nominees be published in the *Motor News* at least 30 days before the annual meeting.[16] By the day of required publication, the management slate may have already garnered enough proxy votes to make the mandatory announcement of insurgent candidacies meaningless. By the day of required publication, the management has had the use of club funds and facilities for proxy solicitations for over ten months. Moreover, even after the required 30-day notice, a nonmanagement candidate

---

[16] There was testimony that an insurgent nominee could buy paid advertising from the *Motor News* and that the *Motor News* would publish proxy cards of insurgent candidates. The bylaws do not require these practices and nothing in the bylaws prevents the management from retracting these offers.

must submit his proxies to the club at least 14 days prior to the annual meeting. The period of free publication exposure to members who wish to vote by proxy is shortened to a maximum of 16 days and the exposure need only be the names of the nominees.

Although the passage is over twenty years old and refers to public issue corporations, one scholar's comments are apropos:

"This is not to say that proxy voting is bad per se. On the contrary, if properly used, it may prove to be the most effective instrument now available to us for furthering democratic control of public issue corporations. However, as presently employed—with the proxy machinery completely dominated by the managers of industry, with the nominations for directors being made by the managers themselves, and with the shareholders being denied the opportunity of making independent nominations in management's proxy statement—the proxy system of voting has become an anti-democratic device, destructive of any real system of checks and balances against possible managerial abuse, and operating in contravention of our fundamental notions of fair play." Caplin, *Shareholder Nominations of Directors: A Program for Fair Corporate Suffrage*, 39 Va L Rev 141, 151 (1953).

Much is at stake in the direction of the club. It is clear that the club wields considerable power in establishing transportation policies in this state and in the financial community through its deposits and investments. Those on the board who control this power should not be allowed to perpetuate themselves in office indefinitely. There should be more director accountability and more access to the board given to nonmanagement candidates. Under the broad mantle of public policy, we find

the amended bylaws unreasonable. *Skutt v Grand Rapids,* 275 Mich 258; 266 NW 344 (1936).

As was stated in *Valle v North Jersey Automobile Club,* 125 NJ Super 302, 318; 310 A2d 518, 526 (1973):

"It is incongruous that such an organization, which controls substantial income and assets contributed by its members, should be considered and conducted as a small club or should have its electoral process so structured that the persons managing it—its board of directors—may, for all practical purposes, be perpetuated in office. The prospect of possible failure of reelection may help instill in each director a sensitivity to the public trust aspect of his role."

Like the trial judge, we do not believe that any relief against defendant DAIIE is appropriate. DAIIE is a reciprocal insurance exchange existing under MCLA 500.7200, *et seq.;* MSA 24.17200, *et seq.* As the court below noted, the statute makes no mention of any requirement that "owners of insurance policies issued by a reciprocal exchange have a voice in its governance". Moreover, the fact that the club's board of directors has been identical to the exchange board of directors for over 30 years suggests that our requiring greater access to the club's board may influence the policies of the exchange.

Reversed in part, affirmed in part. Absent appeal to our Supreme Court, we remand to the trial court for further proceedings. The trial court shall order amendments to the bylaws so as to decrease the comparative disadvantages faced by insurgent candidates.