### S B S BUILDERS, INC *v* MADISON HEIGHTS

1. ZONING—ORDINANCES—LOT AREA—PURPOSE.

   Lot area width and depth requirements in a zoning ordinance prevent overcrowding and undue concentration of population, and preserve the essential residential character of a community; as such, the requirements have a significant role in zoning.

2. ZONING—ORDINANCES—LOT WIDTHS—EXEMPTIONS—AVOIDANCE OF CONFISCATION.

   Zoning ordinance permitting an individual to build on a singly-owned 40-foot-wide lot while denying the same right to another individual solely because he owns two or more contiguous lots is neither discriminatory nor a denial of the equal protection clauses of the Federal and State Constitutions because the ordinance serves a public purpose for the common good of city residents, the classification of persons includes all who are able to comply with the ordinance, and affects alike all persons of the same class; the exemption of those in the class who own one single 40-foot lot was proper because to enforce the ordinance against the class would amount to confiscation of their property.

3. ZONING—ORDINANCES—LOT WIDTHS—REASONABLENESS—EVIDENCE.

   The validity of a zoning ordinance requiring 60-foot-wide lots for single dwelling purposes depends on whether the party attacking the ordinance has shown that the restriction is unreasonable as having no real and substantial relation to the public health, safety, morals and welfare of the community, not whether houses can be built on 40-foot-wide lots and still

REFERENCES FOR POINTS IN HEADNOTES

[1] 58 Am Jur, Zoning §§ 50, 52.
[2, 3, 5, 6] 58 Am Jur, Zoning §§ 50, 52, 140, 141.
[4] 58 Am Jur, Zoning §§ 21, 22.

meet all the requirements for public health, safety, and welfare, as prescribed in the city's building code.

4. Zoning—Ordinances—Unreasonableness—Burden of Proof.
Objectors to a zoning ordinance must assume the burden of proving it unreasonable, since a zoning ordinance is presumed reasonable and constitutional.

5. Zoning—Lot Widths—Legislative Policy.
Requiring lot widths of 65 feet for single residences has been determined by the Legislature to promote the public health, safety, and general welfare (MCLA 560.186).

6. Zoning—Ordinances—Lot Widths—Reasonableness—Evidence.
A zoning ordinance requiring minimum 60-foot-wide lots for single dwelling houses was not shown to be invalid, even though the city's master plan did not mention lot widths, where the city's planning director testified as to the desirability of large lots to avoid congestion and safety hazards, the Assistant Director of the Detroit City Planning Commission testified as to how small lots contributed to various kinds of pollution and as to how larger lots reduced fire and health hazards and traffic congestion, and the Legislature, as shown in the Subdivision Control Act, has determined that requiring lot widths of 65 feet for single dwellings promotes the public health, safety, and general welfare.

Appeal from Oakland, William John Beer, J. Submitted Division 2 November 11, 1971, at Detroit. (Docket No. 11178.) Decided January 21, 1972. Leave to appeal granted, 387 Mich 796.

Complaint by S B S Builders, Inc, and Seligman & Associates, Inc, against the City of Madison Heights and Martin Payne, its chief building inspector, for a writ of mandamus to compel issuance of house-building permits. Judgment for plaintiffs. Defendants appeal. Reversed.

*Hyman & Rice* (by *Hanley M. Gurwin*), for plaintiffs.

*Harry H. Young,* for defendants.

Before: Holbrook, P. J., and J. H. Gillis and
Van Valkenburg,* JJ.

Holbrook, P. J.   This is a zoning case before this
Court for the second time.   In *S B S Builders, Inc* v
*Madison Heights,* 21 Mich App 587 (1970), our
Court reversed the judgment of the trial court which
held that a zoning ordinance of defendant city, § 10-
.503(2)[1] was unconstitutional on its face and re-
manded the case to the trial court with the direction:

---

* Former circuit judge, sitting on the Court of Appeals by as-
signment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] The subject ordinance requires lots to be at least 60 feet wide
and houses built thereon to be used for single dwelling purposes,
subject to the following provisions:

"Nonconforming Lots:   In any district in which single family
dwellings are permitted, notwithstanding limitations imposed by
other provisions of this ordinance, a single family dwelling and
customary accessory buildings may be erected on any single lot or
record at the effective date of adoption or amendment of this ordi-
nance, provided such lot is located in a block on which fifty-one (51%)
per cent or more of the lots on both sides of the street are occupied
by single family dwellings.   Where fifty-one (51%) per cent or
more of the existing homes are built upon a larger lot or combi-
nation of lots, a building permit will not be granted for a lot of
less area or width than the size of the lots of the majority of the
dwellings existing at the time of passage of this ordinance.   In those
areas where less than fifty-one (51%) per cent of the lots are built
upon in a one (1) block area, the provisions regarding the use of
combined lots shall apply.   Permission to use a single nonconform-
ing lot as herein provided shall apply even though such lot fails
to meet the requirements for area or width; or both, that are gen-
erally applicable in the district, provided that yard dimensions and
other requirements not involving area or width or both, or the lot
shall conform to the regulations for the district in which lot is
located.

"If two (2) or more lots or combinations of lots and portions
of lots with continuous frontage in single ownership are on record
at the time of passage or amendment of this ordinance, and if all
or part of the lots do not meet the requirements for lot width and
area as established by this ordinance, the lands involved shall be
considered to be an undivided parcel for the purposes of this or-
dinance, and no portion of said parcel shall be used or occupied
which does not meet lot width and area requirements established
by this ordinance, nor shall any division of the parcel be made which
leaves remaining any lot with width or area below the requirements
stated in this ordinance."

"On remand the plaintiffs must establish that the ordinance has no reasonable relationship to the health, safety, or general welfare of the city's residents, or mandamus may not issue. See *Rottman* v *Township of Waterford*, 13 Mich App 271 (1968)."

The facts therein stated are incorporated herein and we add all necessary additional facts.

After a two-day hearing before the trial court, a judgment was entered which ruled the ordinance was invalid as applied to plaintiffs' property and a writ of mandamus was issued directing defendants to issue three building permits for three houses to be erected on plaintiffs' 40-foot lots.

There are two issues raised on this appeal which we deal with in order.

I.

Is § 10.503 of the zoning ordinance of the City of Madison Heights unconstitutional on its face?

Plaintiffs' position simply stated is that the ordinance which permits one individual to build on a 40-foot lot (singly owned) while denying the same right to another individual solely because he owns two or more contiguous lots is discriminatory and a clear denial of the equal protection of the laws guaranteed by both the Michigan and United States Constitutions.

The defendants assert that § 10.503(2), the exception permitting single ownership lots to be used for the building of a home, is a properly recognized zoning device to prevent confiscation of such property. *Robyns* v *City of Dearborn*, 341 Mich 495 (1954); *Ritenour* v *Township of Dearborn*, 326 Mich 242 (1949).

This issue was presented to the trial court but not determined because of its decision on issue II herein.

The fact that the defendant's city council recognized the law applicable to single-owned 40-foot lots and exempted them from the operation of the ordinance is hardly sufficient reason to declare the entire zoning ordinance invalid. Further, the fact that the land was platted in 1923 in 40-foot-wide lots and that a major share of the subject subdivision has been built up with homes built on these 40-foot lots does not, *per se,* excuse the plaintiffs from complying with the ordinance. *Korby* v *Township of Redford,* 348 Mich 193 (1957); *Hungerford* v *Township of Dearborn,* 362 Mich 126 (1960); *Padover* v *Township of Farmington,* 374 Mich 622 (1965); and *Bierce* v *Gross,* 47 NJ Super 148; 135 A2d 561 (1957).

In 2 Anderson, American Law of Zoning, § 8.49, pp 53–54, 56–57 it is stated:

"Before the subdivision of land was subjected to municipal control, a great deal of municipal land had been divided into small lots, many with less than 30 feet of frontage and less than 3,000 square feet of space. When greater frontage and area requirements were superimposed upon this pattern, many owners were left with substandard lots. Strict and literal enforcement of the more stringent regulations would have made such lots useless to their owners and to the community. In addition, the regulations which destroyed the use value of such substandard lots would have been held confiscatory.

"To avoid this result, most ordinances provide some relief for the owner of a substandard lot. * * *

"The common exception of lots which were recorded prior to the effective date of a restrictive ordinance is limited to lots which were in single and separate ownership on that date. Under such a provision, an owner is entitled to an exception only if his lot is isolated. If the owner of such a lot owns another lot adjacent to it, he is not entitled to an exception. Rather, he must combine the two lots to

form one which will meet, or more closely approximate, the frontage and area requirements of the ordinance. Where, for example, a landowner held four contiguous lots which each had a frontage of 20 feet, he was regarded as owning 80 feet of frontage and was required to redivide the land consistent with the zoning regulations. This requirement was held reasonable as it permitted him some reasonable use of his land. The same result was reached where the owner of a lot containing 5,000 square feet acquired a contiguous lot of the same size. Under the ordinance he was considered to own a lot of 10,000 square feet."

In determining whether an ordinance is unconstitutional because violative of the equal protection clauses of the State and Federal Constitutions, we refer to the case of *Fox* v *Employment Security Commission,* 379 Mich 579, 588–589 (1967), wherein Mr. Justice T. M. KAVANAGH states:

"This Court has held numerous times that the Michigan Const 1908, art 2, § 1, secures the same right of equal protection as does its counterpart in the Constitution of the United States. *Gauthier* v *Campbell, Wyant & Cannon Foundry Company,* 360 Mich 510, 514 (1960), and cases therein cited. The same provisions in Const 1963, art 1, §§ 1 and 2, must likewise be held to afford the same rights as the Federal equal protection clause.

"There is no doubt that State legislatures have a broad range of discretion in establishing classifications in the exercise of their powers of regulation. However, the constitutional guarantees of equal protection are interposed against discriminations that are entirely arbitrary. In determining what is within legislative discretion and what is arbitrary, regard must be had for the particular subject of the State legislation. There must be a relation between the classification and the purposes of the act in which it is found. *Smith* v *Cahoon, Sheriff,* 283 US 553,

566; 51 S Ct 582, 587; 75 L Ed 1264, 1274 (1931); *Morey v Doud,* 354 US 457, 465; 77 S Ct 1344, 1350; 1 L Ed 2d 1485, 1491 (1957); *Beauty Built Construction Corporation v City of Warren,* 375 Mich 229 (1965); *Palmer Park Theatre Company v City of Highland Park,* 362 Mich 326 (1961).

"In the case of *People v Chapman,* 301 Mich 584 (1942), a statute of this State was challenged as unconstitutionally denying the defendant therein equal protection of the laws. Justice Starr, writing for the Court, stated (pp 597–598):

" 'It is well recognized that the legislature may make classifications of persons, provided such classifications are based on substantial distinctions and are in accord with the aims sought to be achieved. (Citing cases.) However, such classification must be neither arbitrary nor capricious, but must rest on reasonable and justifiable foundations. In *Haynes v Lapeer Circuit Judge, supra,* [201 Mich 138 (1918)] p 141, the rule is stated:

" ' "Legislation which, in carrying out a public purpose for the common good, is limited by reasonable and justifiable differentiation to a distinct type of class of persons is not for that reason unconstitutional because class legislation, if germane to the object of the enactment and made uniform in its operation upon all persons of the class to which it naturally applies; but if it fails to include and affect alike all persons of the same class, and extends immunities or privileges to one portion and denies them to others of like kind, by unreasonable or arbitrary subclassification, it comes within the constitutional prohibition against class legislation." '

"See, also, *Davidow v Wadsworth Manfg. Co,* 211 Mich 90, 97–102 (1920); *Peninsular Stove Co v Burton,* 220 Mich 284, 286 (1922); *Smith v Wayne Probate Judge,* 231 Mich 409 (1925)."

The relevant enabling statutes granting defendant city the power to enact a zoning ordinance are

MCLA 125.581 *et seq;* MSA 5.2931 *et seq.* The subject zoning ordinance of defendant city is in conformance with the stated enabling statute.

To resolve the issue presented, we must determine whether there is a proper relationship between the classification (those owning contiguous 40-foot lots) and the purposes of ordinance § 10.503. The title, intent, and preamble to this ordinance read:

### "Title

"An ordinance to regulate and restrict the location and use of buildings, structures and land for trade, industry, residence and for public and semipublic or other specified uses; and to regulate and limit the height; and bulk of buildings and other structures; *to regulate and to determine the size of yards, courts, and open spaces; to regulate and limit the density of population; and for said purposes to divide the city into districts and establishing the boundaries thereof;* providing for changes in the regulations; restrictions and boundaries of such districts; defining certain terms used herein; providing for enforcement; establishing a Board of Appeals; and imposing penalties for the violation of this ordinance.

### "Intent

"*All land zones are hereby declared to be exclusive and restricted to the designated areas.*

### "Preamble

"Pursuant to the authority conferred by Public Act No. 207 of the Public Acts of 1921 of the State of Michigan, and acts amendatory thereto, in such case, made and provided and *for the purpose of promoting and protecting the public health, safety, peace, morals, comfort, convenience, and general welfare of the inhabitants of the City of Madison Heights by protecting and conserving the character and social and economic stability of the residential, commercial, industrial and other use areas; by se-*

*curing the most appropriate use of land; preventing*
*overcrowding of land and undue congestion of popu-*
*lation; providing adequate light, air, and reasonable*
*access; and facilitating adequate and economical*
*provision of transportation, water, sewer, schools,*
*recreation, and other public requirements,* and by
other means, all in accordance with a comprehensive
plan; now therefore :" (Emphasis supplied.)

We deem the purposes of the ordinance to be those
contained in the above language appearing in italics.

We further point out that area width and depth
requirements have a significant role in zoning and
their purpose is to prevent overcrowding and undue
concentration of population and to preserve the es-
sential residential character of a community.

These purposes are clear and would permit dis-
tricting of the property in question to the R-2 clas-
sification (single residences on 60-foot-wide lots).
We rule that the ordinance on its face serves a pub-
lic purpose for a common good for the residents of
the defendant city and that the classification of per-
sons in question includes all who are able to comply
with the ordinance, *i.e.*, have sufficient land to place
a single residence on a lot which is at least 60-foot
wide. The classification includes and affects alike
all persons of the same class. The other class is
exempt by law from the operation of the ordinance
(those who only own one single 40-foot lot) because
to enforce it against this class would amount to con-
fiscation of their property.

Plaintiffs cite the case of *Lengel* v *Pirnie,* 128
NYS2d 490 (1954), as supporting the position that
failure to exempt adjacent lots in common ownership
is an abuse of the state's police power. In *Lengel,*
the facts are not analogous in that the width of the
two lots involved had been approved by the local

planning board before filing. Further, we decline to follow the rule the case purports to make.

## II.

Is the Madison Heights zoning ordinance, particularly § 10.300 *et seq,* unconstitutional as applied to the plaintiffs' lots because the ordinance bears no reasonable relationship to the general health, safety, or welfare of the community?

The learned trial judge after trial made the following determination:

"I am persuaded, by the weight of the testimony, that the ordinance here involved has absolutely no reasonable relationship to the health, safety or general welfare of the people involved or the City of Madison Heights.

"In fact, to the contrary, by a fair preponderance of the evidence, it has been exclusively proven to my satisfaction that residential homes can be easily erected on the forty-foot lots involved and that human beings may inhabit these homes and live there safely without detriment to the public health, safety, and general welfare of the community, without causing congestion on the public streets or without detriment to the property values or injury to the general trend and character of building and population development.

"There are adequate public utilities fully available."

It is true as defendants assert that an appellate court hears zoning appeals, *de novo. Padover* v *Township of Farmington, supra.*

We now look at the record to determine what evidence was before the trial court when it made its determination.

Plaintiffs are the owners by purchase in 1958 of contiguous lots 151, 152, and 153 in Symphony Park

subdivision platted in 1923 as 40-foot-wide lots. Defendant city was incorporated into a "home rule" city in 1955 and included the subject property. At the time of incorporation the city had a population of approximately 10,000. In 1970 the city had grown considerably to approximately 38,600 residents. In 1964 the defendant city adopted a master plan for the proper development of the city after a three-year study and resulting report from a recognized planning firm. The original zoning ordinance was duly adopted in 1965 and zoned plaintiffs' property as R-3 which required single residential lots of at least 50-foot widths. Subsequently, in 1967, the defendant city council in the subject ordinance zoned the property R-2 which required 60-foot-wide lots.

Mr. Seligman, president of both plaintiff corporations, testified that plaintiffs have built approximately 50 homes within a radius of 3 or 4 blocks of the subject property. These were built prior to 1968 and nearly all of them were built on 40-foot lots. He testified:

"From time to time, we have owned a lot of property in the immediate neighborhood. We buy scattered lots and build homes on that basis."

During Mr. Seligman's testimony the following appears in the transcript:

"*The Court:* Now, gentlemen, it is in the record, is it not, that a home can be built on any one of these three 40-foot lots and comply with all of the health, safety, welfare regulations of the Madison Heights building code? Is that right? I thought I heard that answer.

"*Mr. Young:* Well, may I rephrase it? We will concede that it is possible to build on a 40-foot lot and comply with the building code of the City of Madison Heights.

"Is that right, Mr. Payne?

"*Mr. Payne:* That's right.

"*The Court:* Well, there is no public health, as such, or safety regulation in the ordinances of Madison Heights that would be offended in any way, is there, by building a house on that lot, that you know of, Mr. Young? You have been the city attorney there for so many years.

"*Mr. Young:* It is conceivable that there might have to be some side-yard variances or rear-yard variances. I don't know, frankly.

"But let me just say this, your Honor: That I don't believe that complying with a building code necessarily or *per se* indicates that the relationship of the existing zoning ordinance violates the health, safety or welfare of the community."

Mrs. Dorothy Lentz, City Clerk of defendant city, testified in part :

"*Q.* Mrs. Lentz, how many years did you live in the city of Madison Heights?

"*A.* Twelve years.

"*Q.* What was the size of your lot?

"*A.* Thirty-five-foot lot.

"*Q.* And who lived in your home with you?

"*A.* My mother, my two children.

"*Q.* Was there any aspect of your home that you felt was not compatible with health, safety, or general welfare?

"*A.* No, sir.

"*Q.* Were all of the homes on your street similarly situated on 35- or 40-foot lots?

"*A.* They were all 40-foot lots except mine.

"*Q.* Was your street well kept?

"*A.* Yes, sir.

"*Q.* Was your home neat?

"*A.* Yes, sir.

"*Q.* Was your house landscaped and properly cared for?

"*A.* Yes.

"*Q.* Did you suffer in any way from inadequate police protection?

"*A.* No, sir.

"*Q.* Were there any major fires that you were aware of on your street?

"*A.* No, sir."

Mr. Todd Kilroy, Planning Director of the City of Madison Heights, testified in part as follows:

"*Q.* (*By Mr. Gurwin, plaintiffs' attorney*): What does the master plan propose to show?

"*A.* The master plan with respect to the subject area?

"*Q.* Yes.

"*A.* Shows that area as residential.

"*Q.* Does it break it down into sub-classifications of residential?

"*A.* No, it does not.

"*Q.* To the extent that this area is zoned residential, is that consistent with the master plan?

"*A.* Yes, it is.

"*Q.* Does the master plan make any recommendations as to lot sizes?

"*A.* No, not that I recall.

"*Q.* Does it make any recommendations as to area of lot size as opposed to width of lot size?

"*A.* I don't think it does. I don't recall specifically, I don't believe it does.

"*Q.* Do you know what the zoning classification was for the area in which lots 151, 152 and 153 is situated at the time of the adoption of the master plan?

"*A.* Let's see—I'm not familiar with the designation, as an example, R-2 or R-3. It was prior to the adoption of our current zoning ordinance, and I don't recall—I believe it was 50-foot lots, but I am not positive. I would have to refer to our past ordinance.

"*Q.* Do you know when the existing zoning map was amended so as to change the zoning classification for this particular block on Alger Street?

"*A.* The specific amendment?

"*Q.* Yes.

"*A.* It was adopted approximately in November of 1967.

"*Q.* Do you have any records with you which would specify exactly when that ordinance was passed changing the zoning for lots 151, 152 and 153, Symphony Park Subdivision?

"*A.* I have the plan commission recommendation. However, I believe our city clerk has that record with her.

"*Q.* Did your planning commission make any recommendation to the city counsel with respect to the rezoning of this one block on Alger Street?

"*A.* The plan commission's recommendation covered a block and a half from Brush Street westerly, and both sides of Alger Street; Brush and Alger being parallel north-south streets. And their recommendation was for the retention of R-3 50-foot lot zoning.

"*Q.* Did the city counsel overrule that recommendation and effect a change of zoning anyway?

"*A.* Yes, according to the record, they did.

"*Q.* And what is the present requirement for lot size on this block on Alger Street?

"*A.* Sixty-foot widths for residential lots.

\* \* \*

"*Q.* (*By Mr. Gurwin*): Do you know the basis for the planning commission's recommendation that the property not be rezoned from the ordinance requirement of 50 feet frontage to 60 feet?

"*A.* I believe at the time the planning commission considered this, that they felt that the majority of the land in the general area was of the 50-foot width development, and that this would be appropriate for the remaining vacant area that was under consideration for rezoning.

"*Q*. I am going to hand you Exhibit 1 and ask you to make reference to the street immediately to the rear of Alger Street, or to the east, which is Brush Boulevard; is that correct?

"*A*. Right.

"*Q*. And beginning with lots 67 up to lot 81, which is a full block, do you have knowledge of whether or not that street has been developed?

"*A*. I believe it has been developed, yes.

"*Q*. And would it be fair to say that that entire block has been developed with 40-foot homes?

"*A*. No, it wouldn't be fair to say that. The majority of the lots are 39 feet wide.

"*Q*. Thirty-nine feet wide.

"Would it be fair to say that each of those lots has been developed with one residence thereon?

"*A*. I would imagine so.

"*Q*. Okay.

"Are you familiar with lot 149, which is on the corner of Vermont and Alger Street, two lots down from the subject property?

"*A*. Yes.

"*Q*. Is there a single house on that particular lot of record?

"*A*. That lot has a single home on it, that's correct.

\*     \*     \*

"*Q*. Do you feel, in your opinion, that this ordinance adequately protects the community in terms of health, safety, and general welfare in those areas?

"*A*. I believe if the setbacks are maintained on those lots that are permitted to be developed under the terms of the ordinance, the general health and welfare may be protected.

"*Q*. If lot 151 were owned by an individual owner who did not own 152 or 153, under the terms of your ordinance, would that owner have been permitted to build a home on lot 151?

"*A.* According to our attorney's interpretation, yes.

"*Q.* As city planner, do you know of any reason why that would be detrimental to the health, safety, and general welfare of the community?

"*A.* No, I can't see any reason why it would be detrimental *per se.*

\*   \*   \*

"*Q.* (*By Mr. Gurwin*): Mr. Kilroy, I am going to hand you something which has not been marked as an exhibit because I give it to you to only help you refresh your recollection in testifying. This is a facsimile of plat maps of the surrounding area to this property pasted together to form an over-all picture.

"In looking at it, can you recognize the area that we are talking about here?

"*A.* Yes.

"*Q.* Are you oriented in north, east, south, and west?

"*A.* Yes.

"*Q.* Do you see Alger Street on this map?

"*A.* Yes.

"*Q.* How far north of Eleven Mile Road is Alger Street?

"*A.* It runs two blocks in a north-south direction.

"*Q.* And the subject property, lots 151, 2, and 3, is how far from Eleven Mile Road?

"*A.* It is approximately one block north of Eleven Mile.

"*Q.* And how far is it from John R? Which would be on the east.

"*A.* Approximately a block and a half.

"*Q.* Now, in that block immediately south of the subject property, the block between John—between Eleven Mile Road and the intersection near where this property is located, what are the size of the residential lots in that first block?

"*A.* Do you mean on Alger Street?

"*Q.* On Alger Street.

"*A.* As shown on this drawing, the majority of lot sizes are 39 feet.

"*Q.* Are you familiar with this Block?

"*A.* Yes, I guess so.

"*Q.* Would you tell the Court how it has been developed over the years?

"*A.* In what manner?

"*Q.* What types of homes are on that property and what are the sizes of the building sites?

"*A.* Well, the types of homes that are there are single-family, mostly frame. Some with brick fronts.

"With respect to the size of the buildings, I have no knowledge.

\* \* \*

"*Q.* (*By Mr. Young, defendant's attorney*): Mr. Kilroy, I believe you indicated that a home could be built on a 40-foot lot and be safely lived in so that the individual, his health wouldn't be impaired or his safety wouldn't be impaired; is that right, sir?

"*A.* Yes.

"*Q.* Do you know when the City of Madison Heights was incorporated?

"*A.* In December of 1955.

"*Q.* Since that time, have you examined the records to determine what plats have been recorded within the City of Madison Heights?

"*A.* Generally, over the years, I have, yes.

"*Q.* In any of these plats, have any lots been platted with a width, with a frontage, of less than 50 feet upon any street?

"*A.* Not that I recall. The only situation would be in pie-shaped lots where the building line setback would be in excess of the requirement.

"*Q.* Now, why is it if you know that there is a requirement that lots be a minimum width of 50 feet, what is the concept of that?

"*A. Apparently the concept is that the general health and welfare would be better protected by a*

*larger lot size, larger setback areas, between homes and providing larger lots within the city to encourage larger home construction.*

"*Q.* What about the congestion where there are smaller lots?

"*A. Well, there is no question that the smaller the lot, the more persons per acre, the higher the density and the higher congestion possible.*

"*Q.* Does that in any way affect the health and safety of the individual residing in these houses?

"*A. With the more congestion, of course, the more impaired their safety would be.*

"*Q.* What about play room, living room, would you say that a 40-foot lot is conducive to sufficient play room or living room?

"*Mr. Gurwin:* Your Honor, I think he is leading this witness with these questions.

"*The Court:* He is. I will sustain the objection.

"*Mr. Young:* Now, this is Mr. Gurwin's witness, your Honor, and—

"*The Court (Interposing):* I forgot. You are right. You may have your answer.

"*The Witness:* You mean living area outside the building or—I don't understand the question.

"*Q. (By Mr. Young):* Yes, living area outside the building.

"*A.* The larger lots, the larger the living area.

"*Q.* As a planner, do you find anything objectionable to a 40-foot lot, building upon a 40-foot lot?

"*A. To qualify my answer, as a planner, I find it objectionable. However, it is difficult for me to determine what is the best for the general health and welfare when the majority of the community, exclusive of the area under discussion right now, is developed in larger than 40-foot lots.*

"*Q.* And is it possible to develop this particular area in larger than 40-foot lots?

"*A.* Yes, it is possible.

*"Q.* As a matter of fact, it is being developed in larger than 40-foot lots?

*"A.* That's correct.

\*   \*   \*

*By Mr. Young:*

*"Q.* Mr. Kilroy, I will show you defendant's proposed Exhibit #3 and ask you to identify this.

*"A.* This is a map showing the quarter section which contains the plaintiffs' lots in the area zoned R-2 to 60-foot widths, and the R-3 which is the 50-foot widths.

"It indicates, in red, the plaintiffs' property. And it shows, in dark blue squares, the location of houses either existing or under construction.

*"Q.* Was this prepared by you or under your direction?

*"A.* Under my direction, that's correct.

*"Mr. Gurwin:* I have no objection to this exhibit for the purpose of showing the sizes of the lots throughout the general area surrounding this property. I do object to it for purposes of showing those presently existing or under construction, because it is confined to a three-block area and does not show the existing throughout the area generally and, in that respect, is misleading.

*"The Court:* Well, I will admit the exhibit.

\*   \*   \*

*"Q. (By Mr. Gurwin):* Our property is on Alger Street. What is the first block north of our property?

*"A.* Do you mean up in here (*indicating*)?

*"Q.* If you are on Alger Street and heading north, when you get to the end of the block, what do you get to?

*"A.* The street dead ends.

*"Q.* The street dead ends?

*"A.* Right.

*"Q.* It does not go through?

*"A.* It does not go through.

*"Q.* You reach the back of houses in an adjoining subdivision?

"*A.* Yes.

"*Q.* When was the plat for this subdivision on the north approved by the city?

"*A.* I don't know; I have no knowledge of that.

"*Q.* Isn't it true that as a matter of fact you can't get from that subdivision on the north down into our street without going all the way around over on a different street?

"*A.* That's correct.

"*Q.* So that if you are on our block and head north, before you get into the neighborhood that has been developed on 50-foot lots, and all brick homes in a moderate, middle-class neighborhood, you reach a dead end; is that right?

"*A.* That's correct.

"*Q.* In effect, our block, the second block, is aligned geographically with the first block which is part of a contiguous neighborhood unit; isn't that true?

"*A.* I will say that it is aligned with the first block."

Mr. Martin D. Payne, chief building inspector for defendant city, testified in part as follows:

"*Q.* (*By Mr. Gurwin*): In the City of Madison Heights today, do you permit the issuance of building permits upon building sites which are 40 feet in width?

"*A.* Under certain conditions.

"*Q.* And what are those conditions?

"*A.* A single lot of record that was in single ownership at the time of the adoption of the ordinance on May 6, 1965, is entitled to a permit on that lot.

"In a block having 51% of the lots already built on 40-foot lots, additional lots has [*sic*] a right to a permit.

"*Q.* Do you have any recorded platted lots of less than 40 feet in Madison Heights?

"*A.* That's correct, there is.

"*Q*. Do they also fit within the exception to this ordinance?

"*A*. I would say so.

"*Q*. Within the last five years, has your department issued any building permits for residential homes upon building sites of 40 feet or less?

"*A*. Yes.

"*Q*. What has been the smallest lot that you have issued a building permit for that you can recall?

"*A*. I couldn't answer that. I just don't know.

"*Q*. Can you recall of any that have been specifically less than 40 feet?

"*A*. Not specifically, no.

"*Q*. Can you recall of some that have been 40 feet?

"*A*. I can think of various that may have been 40 feet, but not exactly.

"*Q*. Are you familiar with the building code?

"*A*. I think so.

"*Q*. Can homes be built on 40-foot sites within your city which comply in all respects with the building code?

"*A*. Yes.

"*Q*. In your opinion, can homes be built on 40-foot sites that comply in all respects with every requirement of health, safety and welfare which is incorporated in your building code?

"*A*. Yes." (Emphasis supplied.)

Mr. Elmer E. Mueller, a registered community planner and Assistant Director for the Detroit City Planning Commission, testified for the defendant city in part as follows:

"*Q*. Is there any environmental effect upon a community when homes are built on small lots?

"*A*. There is a detrimental effect.

"*Q*. A detrimental effect?

"*A*. Yes.

"*Q*. In your opinion, would you consider a 40-foot lot a small lot?

"*A*. Based on today's standard, yes.

"*Q*. Can you tell us some of the problems which are encountered in the community when homes are built on small—on 40-foot lots?

"*A*. I would like to say there are many purposes and objectives in lot-size control which, of course, definitely relates to population density, which is one of our serious problems today; in relation to pollution, pollution in the form of air pollution; noise pollution; visual pollution; these are serious problems relating to today's environmental situation. And, therefore, lot-size control.

"When, I think, they have small lots, they have adverse effect toward their goal of improving our environmental situation.

"In the early part of this century, a 30-foot lot was considered adequate because there were no problems that we are faced with today. Some of our social problems are related to congestion. And congestion, of course, is created by a lot-size situation. If you allow a lot of homes in a particular area to reach congestion, this conduces to some of the evils and problems relating to health and general welfare and social problems that are related to it.

"Therefore, some of the reasons I am giving are based on some of these particular factors which I think are extremely important in our present day society. Many of our social problems are related to congestion.

\*    \*    \*

"[*The witness*]: What I am saying, the three lots themselves are not the total, what takes place there in themselves isn't going to solve all of these things. I am saying the standard is based on accomplishing these goals and objectives. And if the standard is destroyed or eliminated or ruled out, then throughout the entire community, all of the lots which are of lower size than the present-day standard can be broke [*sic*] down and then you are confronted with the problems of that congestion.

"So, what the community is trying to do in this instance is upgrade their standards to what is considered a decent, normal, desirable situation. Not only in relation to the community as a whole, but to the individual family. And the individual family, I believe—and my profession believes—is entitled to certain environmental conditions, and lot size is related to that. A decent place and adequate size to rear children, safety in relation to minimizing fire hazards, minimizing health hazards, traffic congestion, these are all related to lot size; because lot size is the basic determining situation as to what creates density.

\*   \*   \*

"*Q.* (*By Mr. Young*): In your opinion, are the lot-size controls as provided for in the City of Madison Heights necessary to realize the objectives and goals that you have outlined?

"*A.* I definitely believe so, yes.

"*Q.* Do you believe that Madison Heights lot-size requirements are unreasonable or prohibitive?

"*A.* No, I do not.

"*Q.* Do you believe they are necessary to provide the environmental condition that will be conducive to health, safety and welfare of the residents of the city?

"*A.* Yes."

At the time of the commencement of this litigation, no homes had been built in the block on Alger Street where plaintiffs' lots were located. But at the time of trial five homes had been built or were in the process of being built on 60-foot-wide lots.

The question before this Court is not whether houses can be built on the 40-foot-wide lots of the plaintiffs and meet all the requirements for public health, safety, and welfare as prescribed in the building code of the defendant city, but rather have the plaintiffs sustained their burden of proving that

the zoning ordinance adopted in 1967 changing the classification from R-3 (50-foot-wide lots) to R-2 (60-foot-wide lots) is unreasonable as having no real and substantial relation to public health, safety, morals, and welfare of the community?

A zoning ordinance is presumed reasonable and constitutional and objectors must assume the burden of proving it unreasonable. *Hammond* v *Bloomfield Hills Building Inspector,* 331 Mich 551 (1951); *Bassey* v *City of Huntington Woods,* 344 Mich 701 (1956); *Patchak* v *Township of Lansing,* 361 Mich 489 (1960).

In ruling on the instant issue, we must judge this case on the particular facts and circumstances present. *Korby* v *Township of Redford, supra; Christine Building Company* v *City of Troy,* 367 Mich 508 (1962); *Brandau* v *City of Grosse Pointe Park,* 5 Mich App 297 (1966).

In this case we are unable to predicate a finding of reasonableness of the zoning ordinance on the master plan of the city alone, for it recommended only that the subject property should be for single residences. There were no recommended lot widths contained therein. *Biske* v *City of Troy,* 381 Mich 611 (1969).

Our Supreme Court has on many occasions set forth our duty in regard to reviewing equity cases *de novo,* and reiterated the rule in the case of *Biske* v *City of Troy, supra,* at pp 613–614:

"To quote Justice T. M. KAVANAGH, writer of the Court's opinion in the *Christine Case* (pp 517–518):

" 'We hear and consider chancery cases *de novo* on the record on appeal. *Johnson* v *Johnson,* 363 Mich 354 (1961); *Osten-Sacken* v *Steiner,* 356 Mich 468 (1959); *Futernick* v *Cutler,* 356 Mich 33 (1959); *A & C Engineering Co* v *Atherholt,* 355 Mich 677 (1959); *Straith* v *Straith,* 355 Mich 267 (1959); *Ball*

v *Sweeney*, 354 Mich 616. This Court, however, is inclined to give considerable weight to the findings of the trial judge in equity cases. This is primarily because the trial judge is in a better position to test the credibility of the witnesses by observing them in court and hearing them testify than is an appellate court which has no such opportunity. We do not ordinarily disturb the findings of the trial judge in an equity case unless, after an examination of the entire record, we reach the conclusion we would have arrived at a different result had we been in the position of the trial judge.' "

The "Subdivision Control Act of 1967"[2] provides in pertinent part (MCLA 560.186; MSA 26.430 [186]):

"As a condition of approval of the final plat, the following shall apply to all lots and outlots subdivided as defined in section 102:

\*   \*   \*

"(b) No residential lot shall be less than 65 feet wide at the distance of 25 feet from its front line. If a lot diminishes in width from front to rear, it shall be no less than 65 feet wide at a distance of 50 feet from its front line.

\*   \*   \*

"(d) Minimum width and area requirements for residential lots as set forth in this act may be waived in any subdivision where connection to a public water and a public sewer system is available and accessible or where the proprietor before approval of the plat has posted security with the clerk of the municipality as provided in section 182, and where the municipality in which the subdivision is proposed has legally adopted zoning and subdivision control ordinances which include minimum lot width and lot area provisions for residential buildings."

---

[2] MCLA 560.101 *et seq.*; MSA 26.430 (101) et seq.

The purpose of the "Subdivision Control Act of 1967" is stated to be "An act to regulate the subdivision of land; to promote the public health, safety and general welfare; to further the orderly layout and use of land."

Under the stated purpose of the "Subdivision Control Act of 1967" and its provisions, the Legislature has stated, in effect, that requiring lot widths of 65 feet for single residences promotes the public health, safety, and general welfare.

Even though at first blush it might be said that the learned trial judge properly ruled on the issue considered, upon further reflection after reviewing all of the evidence and particularly the testimony of Mr. Kilroy, planning director of defendant city and Mr. Mueller, Assistant Director for the Detroit City Planning Commission, coupled with the important lot width standards set forth in the "Subdivision Control Act of 1967" for single residences, we are compelled to reach the conclusion that had we sat as trial chancellor, we would have been required to arrive at the conclusion that the plaintiffs failed in their burden of proving the zoning ordinance of 1967 of defendant city unreasonable as having no real and substantial relation to public health, safety, morals, or welfare of the community.

We have now ruled that the plaintiffs have failed to show the ordinance unconstitutional, as asserted by plaintiffs in the two issues considered. We, therefore, set aside the writ of mandamus issued by the trial court.

Reversed. Costs to defendants.

All concurred.