# STATE OF MICHIGAN

# COURT OF APPEALS

JOHN R. VIDOLICH II, trustee of JOHN R
VIDOLICH II TRUST,

        Plaintiff/Counter-Defendant-
Appellant,

v

SALINE NORTHVIEW CONDOMINIUM
ASSOCIATION,

        Defendant/Counter-
Plaintiff/Counter-Defendant/Third
Party Plaintiff-Appellee,

and

JOVI ENTERPRISES LLC,

        Counter-Plaintiff/Third Party
Defendant-Appellant,

and

DAWN E. BEDNARSKI,

        Plaintiff.

UNPUBLISHED
December 5, 2017

No. 334579
Washtenaw Circuit Court
LC No. 14-000008-CH

Before: M. J. KELLY, P.J., and RONAYNE KRAUSE and BOONSTRA, JJ.

PER CURIAM.

        Plaintiff John R. Vidolich II, trustee of the John R. Vidolich II Trust Agreement, and counter-plaintiff Jovi Enterprises LLC, technically appeal by right the trial court's order dismissing this case without prejudice pursuant to the parties' stipulation, and substantively appeal the trial court's earlier order that, in relevant part, dismissed the complaint and counter-

-1-

complaint.[1]  Because the corporate and trust entities are, for relevant purposes, functionally alter egos of Vidolich,[2] we will collectively refer to all three as either Vidolich or plaintiffs.  This matter arises out of an ongoing dispute between Vidolich, a unit owner in the Northview Condominium, and the Saline Northview Condominium Association (the Association).  Vidolich was a member of the Association's board until he resigned over a procedural dispute, and he was the Association's website designer and operator until he deleted the website and replaced it with what he concedes was a "gripe site" when the Association wished to take control of the website itself.  Thereafter, Vidolich contends that he has made numerous efforts to vindicate the legal rights of condominium members, ensure that the Association follows the law, obtain outstanding payments for website hosting and services, and gain access to various records; the Association contends that Vidolich has waged a tireless vendetta of harassment and antagonism.  We find the Association's description of events far more persuasive after reviewing the record, and we agree with the trial court that Vidolich's claims are without merit, some without even arguable merit.  We affirm the dismissal of his various claims, and we remand for further proceedings.

## I.  INTRODUCTION

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law.  *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).  When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, we consider all evidence submitted by the parties in the light most favorable to the non-moving party and grant summary disposition only where the evidence fails to establish a genuine issue regarding any material fact.  *Id*. at 120.  A motion brought under MCR 2.116(C)(8) should be granted only where the complaint is so legally deficient that recovery would be impossible even if all well-pleaded facts were true and construed in the light most favorable to the non-moving party.  *Id*. at 119.  Contracts, statutes, court rules, and condominium bylaws are all reviewed de novo as questions of law.  *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003); *Weakland v Toledo Engineering Co, Inc*, 467 Mich 344, 347; 656 NW2d 175, amended on other grounds 468 Mich 1216 (2003); *Grievance Administrator v Underwood*, 462 Mich 188, 193-194; 612 NW2d 116 (2000); *Slatterly v Madiol*, 257 Mich App 242, 251; 668 NW2d 154 (2003); *Dozier v Automobile Club of Michigan*, 69 Mich App 114, 123; 244 NW2d 376 (1976).  We may affirm a grant of summary disposition on grounds that differ from those relied upon by the trial court.  *Adell Broadcasting v Apex Media Sales*, 269 Mich App 6, 12; 708 NW2d 778 (2005).

---

[1] The parties' initial stipulated order was not a final order appealable by right, but after this Court dismissed a prior attempted appeal on that basis, the trial court entered an order that misconstrued our dismissal as an adjudication on the merits and effectively held that the counterclaims previously dismissed without prejudice were now not subject to revival, making it an "order that disposes of all the claims and adjudicates the rights and liabilities of all the parties" pursuant to MCR 7.202(6)(a)(i).  We entered an order to that effect on October 26, 2016.

[2] We do not, however, perceive in the record any indication that Vidolich has abused any corporate forms.  See *Green v Ziegelman*, 310 Mich App 436, 450–459; 873 NW2d 794 (2015).

The facts in this matter are complex and not readily amenable either to a strict chronological narrative or a strict conceptual narrative. Because the constellation of facts in this matter is so unusual and the legal issues sufficiently ordinary, we do not feel it likely that this matter will be edifying or pertinent to the bench and bar for reference in future matters, and in an effort to avoid exhausting or overwhelming readers, we therefore provide only abbreviated detail where necessary. Broadly, Vidolich complains that the Association has committed the following improprieties: enacted an amendment to the Condominium's bylaws without putting the amendment to a vote of all members; failed to follow Robert's Rules of Order at meetings in violation of its bylaws; failed to produce all of its books and records timely upon request as required by the bylaws and by law; failed to fully compensate Vidolich or his corporate entity for developing and hosting the Association's website, and committed "reverse domain name hijacking." Vidolich offers several theories of recovery. We will address these in turn.

As an initial matter, however, we do agree with Vidolich that the trial court erred in finding some issues to be moot. An issue is moot if the courts cannot enter an order granting practical relief or remedy. *Silich v Rongers*, 302 Mich App 137, 151-152; 840 NW2d 1 (2013); *In re Forfeiture of $53.00*, 178 Mich App 480, 485; 444 NW2d 182 (1989). Courts are, with little exception, not empowered to entertain issues that are moot. See generally, *Anway v Grand Rapids R Co*, 211 Mich 592; 179 NW 350 (1920). However, an otherwise moot issue may be appropriate for the courts to address if there is a reasonable expectation that an alleged wrong will occur again. The usual scenario is that an issue is "of public significance and [is] likely to recur, yet may evade judicial review." *In re Midland Pub Co, Inc*, 420 Mich 148, 151 n 2; 362 NW2d 580 (1984). More relevant here, another possibility is that a party "voluntarily ceases an activity challenged as illegal" and it is reasonably probable that the activity will be repeated. *Dep't of Social Services v Emmanual Baptist Preschool*, 434 Mich 380, 425; 455 NW2d 1 (1990) (CAVANAGH, J). However, a contingency that is merely possible does not raise an issue beyond a mere abstraction, which would be inappropriate for a court to determine. *City of Novi v Robert Adell Children's Funded Trust*, 473 Mich 242, 262-263; 701 NW2d 144 (2005). A declaratory judgment may be obtained before harm occurs, but such harm must nevertheless be immediately and concretely anticipated rather than hypothetical. *UAW v Central Michigan Univ Trustees*, 295 Mich App 486, 495; 815 NW2d 132 (2012).

In this matter, it is manifestly apparent from Vidolich's conduct that he intends to continue making an issue of his disagreement with how the Association's board conducts its affairs whether or not there is any sound reason to do so. The fact that a disruptive, antagonistic force of pettifoggery exists in the system appears to be itself enough of a basis to conclude that future disputes *will* occur and are not merely hypothetical, making a determination of the Association's rights to govern its affairs, and one angry owner's rights to interfere, not merely an abstract issue. We therefore conclude, reluctantly, that the trial court should not have found some of these issues moot, and we are forced to adjudicate them.

## II. THE "FIRST AMENDMENT" TO THE CONDOMINIUM BYLAWS

The Northview Condominium's bylaws state, in relevant part, that the Association's board of directors may amend the bylaws "provided that such amendments do not materially alter or change the rights of co-owners, mortgagees or other interested parties" and otherwise generally require a two-thirds majority vote of all co-owners. The bylaws as originally enacted

provided a quorum requirement of 30% of the co-owners, in person or by proxy, for Association meetings. According to board members, the Association had regular difficulty obtaining that quorum. In May of 2013, the Association's board, without a vote of the co-owners, enacted a "First Amendment" that added the following language to the quorum requirement:

> If a quorum shall not be present at any meeting, the members present may adjourn the meeting for not more than thirty (30) days, and the quorum for said rescheduled meeting shall be one-half (1/2) of that required at the preceding meeting.

Vidolich took vigorous exception to this amendment, contending that it violated the prohibition against an amendment that "materially alter[s] or change[s] the rights of co-owners." Less than a year later, the Association rescinded the language. Board members noted that the rescission was largely due to Vidolich's conduct, which they generally deemed irate and harassing.

As noted, the trial court found this issue moot because the First Amendment had been rescinded. Vidolich demands that he is entitled to an adjudication of the propriety thereof. We agree. It is clear on its face that the Association correctly argues that the First Amendment did not "materially" affect the rights of the co-owners, and furthermore Vidolich's arguments to the contrary were frivolous.

At the most basic, the First Amendment's reduction of quorum requirements was strictly contingent on an insufficient number of co-owners *desiring to exercise any rights at all.* Vidolich fails to articulate *how* the First Amendment purportedly affected any members' rights other than stating that it "clearly dilutes the voting rights afforded to co-owners under the original Bylaws." It does nothing of the sort. The only even arguable right it affects would be a hypothetical right to contribute to the prevention of an annual meeting from occurring by refraining from attending, which is not a right articulated anywhere in the bylaws that we can find. The First Amendment precluded no one from attending, and it affected none of the provisions calling for votes of all co-owners. Vidolich's argument that "any decision made by the membership at a meeting usually requires a majority vote, this means that potentially 20 units could be voting at a meeting to make a decision for all 252 units" is technically accurate but seriously misleading. As the Association points out, the only matter voted on by a majority of the quorum at an annual meeting is appointments to the board. Because the *only* way the quorum can be reduced is for the co-owners to *voluntarily relinquish* any potential rights, this cannot "materially" alter them.

We therefore hold that the First Amendment was entirely proper for the Association's board to enact without a co-owner vote, because it did not "materially" affect the rights of the co-owners. We therefore need not discuss the applicability of any theories of recovery. We note that the parties' consent judgment and stipulation expressly agreed to dismiss with prejudice any claim either party might have for sanctions based upon frivolity. While not binding on us, we choose to respect this agreement.

## III. FAILURE TO FOLLOW PARLIAMENTARY PROCEDURE AT ASSOCIATION MEETINGS

The Condominium's bylaws provide that "[m]eetings of the Association shall be conducted in accordance with Sturgis' Code of Parliamentary Procedure, Roberts Rules of Order or some other generally recognized manual of parliamentary procedure when not otherwise in conflict with the Condominium documents or the laws of the State of Michigan." It is undisputed that the Association historically relied on Robert's Rules of Order. Vidolich argues that the Association's board violated this bylaw provision by adopting certain "standing rules" without a majority vote of the co-owners and by failing to address certain "points of order" he raised at the 2013 annual meeting. He further argues that the trial court erred in relying on the fact that there is no law dictating the use of parliamentary procedure. We agree only with the latter point, but find it immaterial.

We note first that the phrase "in accordance with" is not *necessarily* synonymous with "following" or "in total compliance with." Common usage suggests otherwise, that "in accordance with" is somewhat looser, and more synonymous with "not inconsistent with." Although the "absurd result rule" in statutory interpretation does not permit departure from the literal language of a statute, it *does* call for the avoidance of absurdity to the extent possible if any construction proves necessary. *Piccalo v Nix*, 466 Mich 861; 643 NW2d 233 (2002); *Rafferty v Markovitz*, 461 Mich 265, 270; 602 NW2d 367 (1999). We believe the same principle applies to the interpretation of contracts. We find the phrase "in accordance with" sufficiently vague and amenable to multiple understandings in this matter and on these facts that some construction *is* necessary.

The Association persuasively argues that it would make no sense to require unthinking and mechanical enslavement to a massive, complex tome of formal conduct under all circumstances. Indeed, doing so may well be an invitation to disaster. To the extent the phrase "in accordance with" is somewhat vague, prohibiting the board from exercising flexibility and adaptability in running meetings *would* be the absurd result. The only reasonable interpretation of the bylaw provision at issue is that a hypertechnical adherence to every minutia within Robert's Rules of Order is not required, and therefore "failing to follow Robert's Rules of Order" is not *per se* actionable unless the departure is a significant one. This is especially true given that different manuals of parliamentary procedure might differ in some minor ways, and the Association's use of Robert's Rules of Order in particular is clearly a matter of tradition rather than strict mandate.

Vidolich first argues that the Association violated Robert's Rules of Order by adopting the "standing rules" without a membership vote. We are unpersuaded from the materials provided to us or that we can find in conducting our own research.

The excerpts from what we presume to be the 11th edition of Robert's Rules of Order submitted to us by Vidolich indicate that "standing rules" can mean a variety of different things depending on context. In some of those contexts, "[w]hatever names an assembly may apply to its various rules, the vote required to adopt, amend, or suspend a particular rule is determined by the nature of its content according to the definitions given above," which is unhelpful because it does not provide any clear definitions. It notes that legislative bodies might call their rules of order "standing rules," or it might refer to rules "related to the details of the administration of a society rather than to parliamentary procedure." It is not obvious that the "standing rules" at issue in this matter are, in fact, "standing rules" as the drafters of Robert's Rules of Order would

understand them. The law is not concerned so much with nomenclature as substance. See *In re Traub Estate*, 354 Mich 263, 278-279; 92 NW2d 480 (1958). In any event, the Rules provide that a standing rule under some of those possible definitions "can be adopted by a majority vote" but does not say that it "must be" or "can only be."

Our own research from the materials we have on hand suggests that true "standing rules" concern administration rather than parliamentary procedure, and because the "standing rules" at issue here involved conduct at meetings, they probably are not even real "standing rules" at all, no matter what the board called them. Furthermore, the discussion thereof is vague regarding whether they must be adopted by a majority of an organization or just an "assembly," or indeed what an "assembly" is in context. Certainly, there is enough confusion and ambiguity that there is no clear violation of Robert's Rules of Order here. The phrase "in accordance with" in the bylaws mandates that any alleged violation of a manual of parliamentary procedure must be immediately obvious to even arguably rise to the level of a violation of the bylaws. It is far from obvious to us that the adoption of the "standing rules" did in fact violate Robert's Rules of Order.

Vidolich also argues that the Association's board violated Robert's Rules of Order during the 2013 annual meeting by improperly responding to his efforts to raise points of order. The Association points out that Robert's Rules of Order explicitly provide for appeals from decisions by the chair of an assembly, and states that "'[m]embers have no right to criticize a ruling of the chair unless they appeal from his decision.'" No such provision was in any materials provided to us, but our own research verified that the Association accurately cites an extant provision. There is no dispute as far as we can determine that Vidolich left the meeting instead of attempting to appeal any of the alleged violations. Considering his reliance on the particulars of Robert's Rules of Order, we conclude that his own arguments bind him to having no right to criticize the Association's board's actions as a result.

IV. VIDOLICH'S REQUESTS FOR THE ASSOCIATION'S BOOKS AND RECORDS

Under the Condominium bylaws, the Association is required to keep certain accounting records, and they "and all other Association records shall be open for inspection by the co-owners and their mortgagees during reasonable working hours." Pursuant to MCL 559.157(1) of the Condominium Act, "The books, records, contracts, and financial statements concerning the administration and operation of the condominium project shall be available for examination by any of the co-owners and their mortgagees at convenient times." Pursuant to the version of the Nonprofit Corporation Act in effect prior to 2015, MCL 450.2485 required such corporations to keep certain kinds of records. The relevant version of MCL 450.2487(2) provided in relevant part that members "upon at least 10 days' written notice, may examine for any proper purpose … its minutes of shareholders' or members' meetings and record of shareholders or members and make extracts thereof," and under subsection (3) production of records could be compelled "[u]pon proof by a shareholder or member of a proper purpose." Vidolich contends that, pursuant to these three general provisions, he was entitled to examine the entirety of the Association's records and make extracts therefrom.

Some historical perspective on the parties' interactions is necessary. Vidolich has been, either personally or through his Trust, an owner of a unit in the Northview Condominium. He ran for, and was elected to, the Association's board in 2003. He served on the board, with an

interruption for two or three years due to an illness, until he resigned in October of 2012. According to Vidolich, his resignation was "[i]n a fit of rage" because he was concerned that the board was using incorrectly-dated proxy forms to obtain a proxy quorum of condominium units for the annual meeting and refused to spend the money to fix the error, which Vidolich deemed to be "pulling a fast one." Some of the other board members provided testimony to the general effect that they had found Vidolich to be personally intimidating, aggressive, or unduly emotional.

As will be discussed in more detail below, Vidolich operated and hosted the Association's website through Jovi for the duration of his tenure on the board and, for a time, continued to do so after his resignation. The Association had been in the practice of posting various documents on the website. Shortly after Vidolich's resignation, the Association board decided "to not post minutes on the website, and to remove all old minutes but to post agendas." Ultimately, as will again be discussed further below, Vidolich unilaterally deleted the website and replaced it with a variety of other materials and maintained it as what he conceded was a "gripe site" against the Association.

In the meantime, however, over the next few months following his resignation, Vidolich and various members of the board exchanged communications that Vidolich generally describes as efforts on his part to review the board's records for compliance with various requirements or proprieties, and the Association describes as an escalating mission of harassment that included outright threats. Our review of the correspondences themselves reveals a mix of both: some of Vidolich's communications appear perfectly reasonable, others certainly present as threatening and abusive. In any event, board members responded to his requests, although Vidolich now contends that they did not do so adequately. On March 22, 2013, the board's president explicitly asked Vidolich to "update [him] with any outstanding requests." Vidolich identified no specific document not provided to him at that time, and he does not dispute that, despite engaging in other communications with board members, he made no further requests for any records until that September.

The trial court found that by declining to follow up on the request to specify any outstanding records, Vidolich effectively conceded the adequacy of the Association's responses to his 2012-2013 record requests. We agree. Any reasonable person would conclude from Vidolich's lack of response that he was either satisfied or no longer interested.

That September, shortly after the board asked Vidolich to turn over control of the website, Vidolich, through his attorney, sent a letter to the Association demanding, among other matters, that the Association provide Vidolich with "access to the Association's books, records and contracts for inspection." Notably, the letter does not specify any records in particular beyond "including, but not limited to, meeting minutes and financial reports/audits." The Association provided a collection of records, and what the parties refer to as an "inspection" occurred on October 17, 2013, although the parties characterize what occurred during the inspection differently. Vidolich contends that the Association failed to provide *all* records, and even held at least one document too far away from him for him to read it. He hand wrote a letter demanding further records. The members of the Association's board who agreed to be present at the inspection, in contrast, both noted and testified that Vidolich barely even looked at any of the produced records; rather, he spent most of the time talking about his rights and his issues with

the board and his medical history, and spent the last half-hour of the meeting handwriting the demand for more. It is apparently undisputed that the Association did not in fact provide literally all of its records, and Vidolich appears to tacitly concede that he wanted the records primarily, or even solely, to vindicate his right to obtain them.

In any event, the handwritten demand was slightly more specific, and Vidolich's attorney sent another demand for various records. The letter from Vidolich's attorney further requested that another inspection be held on November 11, 2013. Apparently, further negotiations ensued regarding a possible inspection date, ultimately culminating in an offer by the Association for January 14, 2014. Vidolich rejected the proffered inspection date because of a doctor's appointment and noted that he would be "out of the country for medical reasons" between January 31 and February 18, 2014, but was otherwise available. However, apparently without waiting for a response from the Association, Vidolich commenced the instant action on January 8, 2014. The parties engaged in further negotiations to arrange an inspection, subject to the Association's desire for a protective order. A five-hour document inspection occurred on December 18, 2014, at which Vidolich tagged a number of documents he wished copies of. Vidolich contends that the Association still did not provide the entirety of the documents he requested for inspection, but fails to provide any supporting evidence that any particular documents were not made available; rather, it is undisputed that the Association conditioned *receipts of copies of* the tagged records on further approval by the Association's board and subject to the Association's desire for a protective order.

The trial court did in fact ultimately grant the protective order, and we can find no allegation in the record suggesting that Vidolich did not thereafter receive all of the documents he tagged. The trial court found this issue therefore moot; as noted, we disagree because it is clear that Vidolich intends to continue making requests for records. However, we agree with the trial court's finding that Vidolich's requests after his first were made for an improper purpose, as did the case evaluators. Vidolich's requests were extremely broad, numerous communications and actions pertaining to the Association's board reflect hostility and abusiveness, Vidolich has all but conceded that he wanted the records solely to vindicate his right to have them, numerous other arguments Vidolich advances are devoid of even arguable merit, and Vidolich has otherwise demonstrated that he is motivated by vindictiveness.

Of note, MCL 450.2487(2) and (3) explicitly condition a right to examine records on having a "proper purpose" for so doing. The Condominium bylaws and MCL 559.157(1) do not, but because legally vindicating a frivolous or vexatious request would at least theoretically be impossible, we think that a "proper purpose" is nevertheless an implicit condition of making any such request to examine records. Additionally, "our courts have recognized a stockholder's common-law right to inspect corporate records for a proper purpose," noting that a proper purpose might include "raising doubts whether corporate affairs had been properly conducted by the directors or management" but would not include "requests to satisfy idle curiosity or aid a blackmailer" or "mere *speculation* of mismanagement." *North Oakland Co Bd of Realtors v Realcomp, Inc*, 226 Mich App 54, 58-59; 572 NW2d 240 (1997) (emphasis added). At its heart, the development of legal rights such as this one has always been for the purpose of providing people with tools to maintain order and decorum, not to provide people with swords with which to create chaos and harm. Vidolich's right to inspect the Association's records is therefore not an absolute one under any cited authority.

Initially, it is manifestly apparent that Vidolich has a tendency to resort to blackmail. Vidolich explicitly conceded that he used the website as what he calls a "gripe site," he explicitly told board members that he intended to post "annotated" versions of at least some of the documents on that website, in fact he *did* post personal information on that website, he admitted that he intended to post further records on the website possibly subject to redacting some personal data, and he threatened board members with criminal prosecution both directly and in public. Vidolich's late-2013 request for records literally sought access to *everything*, which is such an overbroad demand that it can only be explained as a fishing expedition or an effort to inconvenience the Association's board members. Additionally, it was accompanied by other demands that the Association's board did comply with, and by a history of Vidolich's threatening and abusive conduct. Vidolich's handwritten letter and subsequent attorney's letter following his second request were slightly more specific, but contained no hint of why those records were desired. Vidolich would later make further requests in 2015 and 2016 that did actually express concerns that the Association's board's actions may not have been in compliance with the bylaws or the law, but also sought information about its response to his lawsuit and, in any event, offered nothing but speculation and a desire to satisfy himself as to *whether* the board had acted properly in his opinion. Even if it were not speculative as to whether the board acted properly in his opinion, considering the meritlessness of his claims, it is a dubious concern.

Furthermore, it is worth noting that Vidolich has an extensive history of demanding prompt responses from the Association's board, only to reschedule at the last minute, completely call off the inspection at the last minute, or commence suit instead of continuing to arrange a mutually acceptable time. Although Vidolich claims he has health issues, the *pattern* of this conduct strongly suggests disingenuity, and at some point ceases to remain a question of credibility at all. Vidolich correctly observes that it is generally inappropriate to evaluate credibility at a summary disposition stage of proceedings. *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013). However, it is unnecessary to evaluate Vidolich's credibility to determine that much of his purpose in requesting the records was not, in fact, proper. In short, it is manifestly apparent that the trial court and the case evaluators were correct in finding that Vidolich's record requests were frivolous and intended to harm the Association or its board's members.

It is, in short, unambiguous even without resorting to a credibility judgment that Vidolich had no proper purpose in making his record requests after, possibly, the first set of requests that he ultimately failed to follow up on. Vidolich therefore does not have a right, under any authority he cites, to inspect or make extracts of those records, and the Association would have been entirely within its rights to deny Vidolich outright. Instead, the evidence indicates that the Association made commendable efforts to accommodate Vidolich anyway. No matter what theory of recovery he cites, the trial court properly dismissed Vidolich's claims premised on the Association's alleged failures to provide him with records to which he was entitled.

V. DERIVATIVE ACTION UNDER MCL 450.2491

Pursuant to 2014 PA 557, MCL 450.2491 was repealed effective January 15, 2015. However, the complaints in this matter preceded that repeal, as did the allegedly improper acts upon which Vidolich bases his claims. The statute provided:

(1) An action may be brought in the right of a domestic or foreign corporation to procure a judgment in its favor by a record holder or beneficial owner of shares or by a member of the corporation.

(2) In such an action, the complaint shall allege:

(a) That the plaintiff is such a shareholder or member at the time of bringing the action and that the plaintiff was such a shareholder or member at the time of the transaction of which the plaintiff complains, or that the plaintiff's shares, interest therein, or membership devolved upon the plaintiff by operation of law from a person who was a shareholder or member at such time.

(b) With particularity the effort of the plaintiff to secure the initiation of the action by the board or the reasons for not making the effort. [prior MCL 450.2941].

Additionally, the simultaneously-repealed MCL 450.2493(1) provided that a plaintiff bringing such a derivative claim is entitled to fees and expenses if "successful, in whole or in part, or if anything is received by the plaintiff or a claimant as a result of a judgment, compromise, or settlement of an action or claim." Conversely, MCL 450.2493(2) provided that upon "finding that the action was brought without reasonable cause," the plaintiff may be required to pay fees and expenses to the named defendant or defendants.

Vidolich contends that he has articulated a valid derivative claim under the above statute. As an owner of a condominium unit, he would clearly satisfy MCL 450.2491(2)(a). The Association argues that Vidolich's claim necessarily fails the condition in MCL 450.2491(2)(b) because he did not make an express demand; however, the statute does not require one. In contrast, MCL 450.1493a *does* explicitly require a written demand by a shareholder "to take suitable action" as a prerequisite to a derivative action under the Business Corporation Act; the Legislature could have imposed such a requirement but did not. Nonetheless, although it need not be in the form of a written demand, the statute does require some manner of effort, or some justification for failing to make such an effort.

The Association also argues that such a derivative action must be against a third party. This is unwarranted. A derivative suit *may* be against a third party, but the gravamen is that any victory inures to the corporation itself and only incidentally to any particular shareholder, and traditionally the beneficiary corporation is a named defendant despite being substantively a plaintiff. See *Futernick v Statler Builders Inc*, 365 Mich 378, 386-387; 112 NW2d 458 (1961). Indeed, the traditional understanding of a corporate derivative suit is that it is technically against the directors or those in control of a corporation, to remedy wrongs done to the corporation in their capacity as directors or those in control, and the corporation is a named party in order to fully adjudicate all interests. See *Talbot v Scripps*, 31 Mich 268 (1875); *Coxe v Hart*, 53 Mich 557; 19 NW 183 (1884); *Madugula v Taub*, 496 Mich 685, 709; 853 NW2d 75 (2014). Naming the Association as a defendant in a derivative action of this nature would be expected, not prohibited.

Vidolich explicitly admits that at least some of his claims are personal, and thus they would not satisfy the condition of an action brought in the right of a corporation as required by MCL 450.2491(1). However, he has argued, if to some extent only by implication, that the

Association's board wronged the Association itself by adopting the First Amendment to the bylaws without a vote of the co-owners, adopting the Standing Rules for conducting meetings, and failing to address some of his points of order at a meeting, and failing to make its records available to him. The latter two are obviously personal harms to Vidolich in his own right, not derivative claims, and in any event are utterly meritless as discussed elsewhere. However, because the First Amendment and the Standing Rules affect the entire condominium membership, Vidolich has at least competently alleged a wrong "to the corporation." He further alleged that he attempted to persuade the Association's board to rescind both, which, giving Vidolich the benefit of the doubt, does satisfy MCL 450.2493(2)(b). Consequently, we agree with Vidolich that he has stated a claim under MCL 450.2491, and that claim should not have been dismissed pursuant to MCR 2.116(C)(8).

Nevertheless, the claims Vidolich purports to raise on behalf of the Association are themselves derivative of other issues, and as discussed, Vidolich's claims are at best substantively meritless, and some either devoid of even arguable legal merit or clearly pursued for improper purposes. We therefore hold that although Vidolich has successfully *brought* a claim under MCL 450.2491, the Association is entitled to the possibility of sanctions pursuant to MCL 450.2493(2) because it was clearly brought without reasonable cause. Because that provision uses the word "may" and therefore denotes permissiveness rather than a mandate, we leave the imposition of such sanctions, if any, to the discretion of the trial court on remand after providing the parties an opportunity to argue the issue.

## VI. COMPENSATION FOR WEBSITE-RELATED SERVICES

Vidolich contends that the Association failed to compensate him[3] appropriately for services he rendered developing and hosting the Association's website. For no readily explicable reason, the trial court deemed this issue barred by the statute of frauds, which the Association properly makes no effort to defend. Nonetheless, the issue was properly dismissed. Once again, some historical narrative is unavoidable.

Vidolich registered the domain name "saline-northview.org" in September of 2003, in anticipation of running for election to the Association's board, and he created a demonstration website at that time. The Association was undisputedly not involved in the website at that point, and it never owned the domain name. Vidolich testified that he did not believe at the time that the domain name would ever be used officially and he "was doing it to get elected to the board." Nevertheless, Vidolich was subsequently elected to the board, where he became the board's

---

[3] As noted, the evidence suggests that Vidolich may have commingled his identity with that of his corporation. See *Florence Cement Co v Vettraino*, 292 Mich App 461, 469; 807 NW2d 917 (2011). There is some suggestion that he may have done so to avoid a Condominium bylaw prohibiting compensation to board members. However, that bylaw unambiguously only prohibits compensation to board members *as* board members *per se*, not for any other services they might perform for the Association. Vidolich was therefore in no danger of violating that bylaw. As also noted, we find nothing to suggest that Vidolich has actually abused any corporate form or used it to perpetrate some fraud or misconduct. *Green*, 310 Mich App at 450-459.

secretary, and he subsequently maintained the website at saline-northview.org for the Association. Board meeting minutes reflect that Vidolich advised the board that it would have to either accept advertising on the site or pay for the costs to host it. The Association chose the latter, and until 2013, Vidolich billed the Association for hosting costs, and the Association paid those invoices. In April of 2004, Vidolich submitted an invoice for several thousand dollars to the board for website development; that invoice was never paid. Nonetheless, Vidolich continued to act as webmaster, and he performed various aspects of website maintenance, including posting various updates and meeting minutes.

Vidolich testified, and the meeting minutes at least impliedly support, that he repeatedly asked the Association to take formal ownership of the website and domain name, and that there was general agreement that doing so would be wise, but no decision was ever made and thus the suggestion was never acted upon. Vidolich further testified that "they kept adding to the list of things that they wanted on the Website." There appears to be no dispute that he was never compensated for any of his website-related services other than payment of the hosting costs. As noted, Vidolich continued to maintain the website even during his illness-related absence from the board. For a time, he also continued to maintain the website even after he resigned from the board and during his initial dispute with board members over access to records. Vidolich submitted his last invoice for hosting costs on August 28, 2013, covering July 2013 through July 2014, for $184.00. This last invoice was not paid.

On September 11, 2013, the president of the Association's board asked Vidolich to turn the website over to the Association, and, according to the president, he offered to pay at least some of the outstanding invoice. Vidolich instead promptly filed a claim against the Association in small claims court seeking damages in the amount of one cent, and he also deleted all Association content from the website and replaced it with what he tacitly concedes was a "gripe site." Initially, the replacement content consisted of a notice to the effect that the condominium and board members were being sued in Federal court "for failure to follow the Northview Association By-Laws, the Michigan Condominium Act, and the Michigan Freedom of Information Act"; it also, notably, provided those board members' home addresses and telephone numbers. A week later, Vidolich replaced the lawsuit notice with a notice that Northview had failed to pay its costs and was uninterested in purchasing the domain, so it was for sale "and the value of a ten year old domain to spammers, puts the value of the domain at over $6,000." By September 30, 2013, Vidolich replaced the sale notice with links to a "demand letter." He dismissed his claim in small claims court on October 1, 2013.[4] As noted, Vidolich contemporaneously re-opened his demands for access to Association records.

Vidolich contends that the Association improperly—again, pursuant to a variety of theories of recovery—failed to pay the 2004 development invoice, failed to pay the 2013 hosting

---

[4] Association contends that Vidolich did so without notice and it only found out about the dismissal when it tried to remove the action to district court, and Vidolich contends that he dismissed it after the removal had occurred.

invoice, and failed to compensate him equitably for the remainder of his website-related services. Of these, only the 2013 invoice has even arguable merit, and that is limited.

Vidolich himself stated that he created the website of his own accord in the hope and anticipation of becoming a board member. It is a long-standing principle that one cannot gratuitously perform a service or confer a benefit and require compensation or legally impose a duty. *Eakins v American White-Bronze Co*, 75 Mich 568, 571; 42 NW2d 982 (1889); *Staffney v Michigan Millers Mut Ins Co*, 140 Mich App 85, 90; 362 NW2d 897 (1985). Although undisputedly unpaid, the 2004 invoice was long since time-barred under the six-year limitations period in MCL 600.5807(8) by the time the lawsuit was commenced, and Vidolich appears to have made no prior attempt to collect on it. Vidolich argues that there was some manner of promise to pay for the cost of development, but no board or Association meeting minutes reflect this despite Vidolich having been the secretary. At the most, Vidolich cites to the deposition testimony of a board member who stated that she *assumed* the board had approved paying for the development *and* the hosting of the website, which is at best speculative and far from sufficient to create a question of fact. There is no possible basis for rationally asserting that the Association ever assumed an obligation or expectation to pay for the website's development costs.

In contrast, the 2013 invoice would not have been time-barred. However, it covered July 27, 2013, through July 27, 2014, and Vidolich apparently deleted the website altogether on September 11, 2013. The invoice was for a total of $184.00. By our calculations, the Association actually received only $23.63 worth of the billed services. The Association contends that it owes none of this because it had accidentally double-paid a prior invoice, but we believe the Association's apparent failure to demand repayment waives that claim in the same way as Vidolich's failure to follow up on his first demand for records. Furthermore, whether or not there was ever a contract, the parties' course of dealing over many years unambiguously shows that Vidolich had every reasonable expectation of being paid for the hosting costs, which, we perceive, were generally billed in advance.

Nonetheless, Vidolich has no entitlement to bill for services not performed, and the circumstances under which Vidolich terminated those services only to replace them with threats and abuse suggests that he has no proper purpose in claiming a breach of contract and no equitable claim to compensation for what little of that invoice's services he did provide. Even if there was a contract, he was the first party to breach it, and thus he would only be able to maintain an action for a subsequent breach if his had not been "substantial." *Michaels v Amway Corp*, 206 Mich App 644, 650; 522 NW2d 703 (1994). We think Vidolich's breach to be substantial and his hands not to be sufficiently "clean" under the circumstances to avail himself of equity.

Vidolich finally argues that contracts aside, the Association received the benefit of the various other website-related services he rendered, and it would be inequitable for the Association to retain those benefits without compensating him. As noted, Vidolich's creation of the website was gratuitous, and he cites no competent evidence that he was ever promised payment for anything other than hosting costs. His own evidence conflicts with the meeting minutes that he himself, as secretary, would have prepared. Vidolich unambiguously acquiesced in the situation for many years, with full knowledge, and thus has no real basis for concluding

that he was misled. See *Morris Pumps v Centerline Piping Inc*, 273 Mich App 187, 195-196; 729 NW2d 898 (2006). It appears clear that this was not an issue until he had a falling out with the board. We find this claim without merit under the circumstances of this case.

## VII. REVERSE DOMAIN NAME HIJACKING

Vidolich argues that he has a claim for "reverse domain name hijacking" under Federal statutes based on his entirely legal registration of "saline-northview.org" and the Association's efforts to require him to surrender the domain. We do not hold that this was an unreasonable claim for Vidolich to have made in response to the Association's counterclaim seeking to compel the transfer of the domain name, but it is devoid of even arguable legal merit for Vidolich to pursue at the present stage of proceedings.

The concept of "reverse domain name hijacking" is related to "cybersquatting." Both entail ownership of a domain name with significance to, usually but not always, a public or notable person or entity. Cybersquatting entails purchasing a domain name that infringes on a trademark, identity, or other meaningful characteristic of some entity, often in an effort to harass or extort that entity. In contrast, reverse domain name hijacking generally entails an entity seeking to wrest control of a domain that was innocently and legally registered to another person because that domain happens to be meaningful to the entity, often by using legal processes that the entity can afford to engage in and the innocent party cannot afford to defend against.

Vidolich argues that he lawfully registered "saline-northview.org" and the Association, as part of its now-dismissed counterclaim, had wrongfully attempted to force him to transfer the domain at his expense. Under the statute Vidolich cites, however, he has at most articulated a non-actionable *attempt* at reverse domain name hijacking. Pursuant to 15 USC 1114(2)(D)(v):

> A domain name registrant whose domain name *has been* suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter. The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant. [(emphasis added).]

Thus, the statute unambiguously only provides a remedy if a *successful* reverse domain name hijack has *already* occurred. Vidolich claims that his "use of the Domain Name was shut down as a result of this litigation," but the trial court's order explicitly granted summary disposition in Vidolich's favor as to the Association's cybersquatting claim and found no basis to require Vidolich to turn the domain name over, despite confusingly also reciting the same statement Vidolich uses, that "JOVI's use of the Domain Name has been effectively shut down as a result of this litigation." We need not attempt to further define the trial court's opinion, because it is clear from both the record and our own public records search that Vidolich's corporate entity remains the registrant of "saline-northview.org" today. Vidolich admitted at his deposition that although he took all of the materials off the website in response to a demand from an attorney, his registration of the domain name was never suspended, disabled, or transferred. In any event, the "clause (ii)(II)" refers to action taken by the registrar, and none has been.

-14-

Vidolich also argues that because "this case 'involves' an alleged violation of Section 1125 of the Lanham Act," he has stated a claim for reverse domain name hijacking. Vidolich does not explain what he means by this, but it *appears* to be another reference to the Association's counterclaim, which in relevant part alleged that Vidolich had engaged in cybersquatting prohibited by 15 USC 1125(d). Pursuant to 15 USC 1117(d), which Vidolich cites:

> In a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.

However, Vidolich was not the party-plaintiff as to the claim that there was a violation of 15 USC 1125(d), and even if he were, he would have to prevail on any such claim. If there is an applicable provision under which a defendant in an ultimately-unsuccessful claim under 15 USC 1125(d) might be entitled to anything, Vidolich has not cited it. This argument simply does not make sense.

Vidolich finally argues that even if no domain name transfer has yet been compelled, he is not prohibited from seeking preemptive injunctive and declaratory relief. This is, strictly speaking, true. However, the instant situation grossly exceeds this permissiveness. Federal precedent establishes that an action under 15 USC 1114(2)(D)(v) may be permissible to prevent a future transfer of a domain name. *Barcelona.com, Inc v Excelentisimo Ayuntamiento de Barcelona*, 330 F 3d 617, 627 (CA 4, 2003); *Sallen v Corinthians Licenciamentos LTDA*, 273 F 3d 14, 25 n 11 (CA 1, 2001). However, the cited opinions note situations in which the transfer is "inevitable." We do not think the opinions hold that inevitability is the only circumstance under which a preemptive claim may be made, but clearly any transfer must be more than merely possible or speculative, consistent with general principles of standing in any event.

Our interpretation of the trial court's orders is that the Association's counter-complaint was initially dismissed without prejudice "pending the outcome of [the instant] appeal" and with the right to re-file and resume the pursuit of the claims therein if Vidolich prevails in the instant appeal. That order became functionally, if somewhat confusingly, final after our dismissal of Vidolich's first attempted claim of appeal. We think that taken together, the effect is that the Association is now precluded from pursuing those claims unless Vidolich prevails in this appeal, which, barring action from our Supreme Court, he will not. The only danger to Vidolich's retention of the domain name came from the Association's counterclaims, which are now permanently disposed of by stipulation. Consequently, there is no need for Vidolich to vindicate a right to retain possession of the saline-northview.org domain name, because it is at best speculative that he will be required to transfer it in the future.

## VIII. CONCLUSION

Vidolich's claims are without merit, some egregiously so and clearly pursued for improper purposes. We decline to impose sanctions for frivolity out of respect for the parties' agreement foregoing any such sanctions. However, the Association may be entitled to an award

-15-

under MCL 450.2493(2) at the trial court's discretion and subject to a right to be heard on the matter. Furthermore, we understand that there may be other post-judgment matters, such as case evaluation sanctions, to be addressed. We therefore affirm the trial court's dismissal of all of Vidolich's claims, and we remand for any further proceedings as may be warranted not inconsistent with this opinion. We do not retain jurisdiction. The Association, having prevailed in full, may tax costs on appeal pursuant to MCR 7.219(A).

/s/ Michael J. Kelly
/s/ Amy Ronayne Krause
/s/ Mark T. Boonstra